Filed 11/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LAOSD ASBESTOS CASES | B265222 |
| DOROTHY EVANS et al., | (Los Angeles County Super. Ct. No. JCCP4674) |
| Plaintiffs and Appellants, | |
| v. | |
| AMERICAN OPTICAL CORPORATION, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Peter J. Mirich, Judge. Affirmed.

The Arkin Law Firm, Sharon J. Arkin; Farrise Firm and Simona A. Farrise for Plaintiffs and Appellants.

Foley & Mansfield, Jennifer McCormick, Joseph V. Macha, and Judith A. Zipkin for Defendants and Respondents Hood Corporation.

# INTRODUCTION

Plaintiff Kenneth Evans was diagnosed with asbestosis after a decades-long career working for the Southern California Gas Company (SoCalGas). For about 35 percent of his employment, Evans worked alongside contractors who helped build and replace gas pipelines; some of those pipelines were covered in a coating that contained asbestos. Evans and his wife, plaintiff Dorothy Evans, sued several contractors, alleging that they contributed to Evans's asbestosis. By the end of the trial, the only remaining defendant was respondent Hood Corporation, and the only remaining cause of action was negligence. The jury found that Hood's conduct exposed Evans to asbestos, but that Hood was not negligent. A defense judgment was entered, and plaintiffs appealed.

Plaintiffs argue that the court erred by (1) excluding two exhibits containing SoCalGas specifications for contractors, (2) allowing the president of Hood to use a contract from an irrelevant time period to refresh his recollection about the content of earlier contracts, and (3) giving the jury two erroneous instructions: one about employer duties, and another stating that Hood was required to adhere to a "professional" standard of care. We find that the trial court did not err, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.      Evans's work history and related evidence

The trial began against three different contractors, Hood, ARB Inc., and W.M. Lyles Co. Lyles was dismissed from the case mid-trial, and ARB was dismissed from the case just before closing arguments. We therefore focus only on the evidence relating to Hood relevant to this appeal.

Evans testified that he worked for SoCalGas from 1954 to 1990. He started out as a pipeline repairman, and after going to welding school he became a pipeline repairman welder. SoCalGas crews would only do small repairs; larger repairs and pipeline installation jobs were done by contractors. Evans repaired pipe, worked side-by-side with contractors on pipeline work, and inspected the work done by contractors to ensure that it complied with the required specifications. For the inspection work, Evans would

2

ensure that the pipe was placed at the proper depth to match specifications and check the integrity of the contractors' welds. Differentiating between what SoCalGas did and what the contractors did, Evans testified that SoCalGas's job was to deliver gas to customers; the contractors' job was to install the pipelines.

Evans testified that gas delivery pipes generally were 80-foot sections of 20-inch diameter pipe. Each pipe section was "welded together one by one. They were primed, tarred, and wrapped, and then we'd move on to the next joint, another 80-foot." The gas delivery pipes were wrapped in an asbestos coating. Evans and those he worked with referred to the outer coating as "asbestos." The coating was three-eighths of an inch thick. For jobs laying new pipe, the pipes arrived pre-coated with 18 inches of bare pipe at the ends. After the joints were welded and inspected, the workers would cover the bare portions with asbestos coating. To do this, they had to "feather" the edges of the existing coating to a 45-degree angle by grinding it down with an electric wire brush. The joint would then be primed, tarred, and wrapped with layers of coating.

To repair pipe or create a "tie-in"—where new pipe was joined to existing pipe— the asbestos coating on the existing pipe was removed. Contractors "took it off with a hammer. They wire brushed it down . . . ." When Evans personally was working on pipeline repair, he would do this work himself with an axe, scraper, and wire brush. After the repair or tie-in was complete, the pipe was primed, coated with tar, laid with "glass mat," coated with tar again, and then spiral-wrapped with asbestos coating. Evans also worked on MSAs—meter set assemblies—in which individual gas lines were tied into the large gas lines in the street. A similar process was used for this as for other tie-ins.

Evans testified that he worked with a number of different contractors over the years, including the ones who appeared as defendants at trial. He testified that up to 35 percent of his work at SoCalGas involved working with contractors. Evans testified that he did not recall whether he began working with Hood as a contractor in the 1950's or 1960's; his testimony on that issue was inconsistent. When asked about specific jobs, Evans recalled one job with Hood in the 1980's that involved laying miles of six-inch

3

pipeline near Kingsburg, California. For another job in the 1980's, Hood laid miles of pipe that spanned the Kern Canal and tied into a main transfer line. In a third job, Hood worked with SoCalGas installing MSAs in Bakersfield.

Evans testified that on jobs not involving contractors, SoCalGas supplied all the parts used. He also testified that on jobs involving contractors, the contractors supplied the coated pipes and other materials to the job sites. On the other hand, Larry Bruce Svatos, president of Hood Corporation, testified that for all jobs ordered by SoCalGas, "All materials were provided by Southern California Gas." When Hood entered into a contract with SoCalGas, Hood would contact SoCalGas to order the supplies needed for the job, and SoCalGas would then supply the needed materials. Svatos testified that Hood provided the "labor and equipment necessary to perform the job," but "any items that . . . become a permanent part of the gas system [were] supplied by the gas company," including "pipe, fittings, valves, flanges, wrap, any -- any item that is left in the ground."

Evans testified that the SoCalGas specifications for each job dictated what kinds of primer, asbestos wrap, tar, welding rods, and other materials were required to be used for that project. The specifications also included requirements for how pipes would be prepared for welding, how they would be welded together, what kind of testing would be used to check the welds, how the welds were to be covered, and what materials would be used to cover the welds. Contractors were not allowed to deviate from the requirements imposed by SoCalGas. Evans testified that the contractors met the SoCalGas specifications as well as industry-wide standards as they did their work.

Evans testified that dust was created as the asbestos pipe coating was removed and then again when it was replaced. Evans testified that when he did this work himself, it was dusty and he breathed the dust. When the contractors did this work on the jobs he supervised, Evans said he generally was within about three to five feet of the work, and he breathed the dust that was created. Plaintiffs' industrial asbestos expert, Charles Ay, testified that exposure to visible asbestos dust would be considered high-degree exposure. Defense industrial hygiene expert, Howard Spielman, testified about tests involving workers doing similar asbestos pipe wrap removal work. Spielman said the results from

4

the tests indicated that asbestos exposure from such work was below all permissible limits set out by the Occupational Safety and Health Administration (OSHA) and other regulatory agencies, even by today's standards. On cross examination, Spielman agreed that OSHA minimums nonetheless pose a health risk. When asked hypothetical questions about contractors similar to the ones Evans worked with, Ay testified that the contractors did not act reasonably, and Spielman testified that they did act reasonably.

Plaintiffs' expert Ay, over defense objections, also testified that contractors had a responsibility to both complete a job required by a contract, and to "do that job meeting all of the safety rules and regulations on or for that job and that product." Ay discussed posting signs, precautions required for working with hazardous materials, and warning people, saying, "That's the job of any contractor under safety regulations." Ay testified that he was familiar with contracts such as the ones at issue between SoCalGas and contractors such as Hood, and the contractors in this case had a duty to provide a safe working environment for employees.

Plaintiffs' counsel read to the jury testimony by a SoCalGas representative, Sylvester Caudle, who said that SoCalGas changed its procedures for dealing with asbestos sometime between 1978 and 1981. At that point, employees were informed that the pipe wrap had asbestos, and they were required to take precautions when dealing with it, such as wearing masks, wetting the pipe wrap with a solution before removing it, putting tarp under the pipe to catch the removed pipe wrap, sealing up the removed portions of the pipe wrap, and disposing of it properly. Caudle assumed that SoCalGas employees and contractors all received the same information.

Evans, however, testified that when he worked for SoCalGas, he did not know that asbestos could be harmful. He said he never received any safety training from SoCalGas regarding hazardous materials, the dangers of working around natural gas, or anything else. He never received warnings from SoCalGas or his union that asbestos could be hazardous. None of the workers wore respirators, face masks, or protective suits. No one would wet down the pipe wrap before chiseling it off. He never saw signs warning him to stay away from asbestos dust. When Evans shifted into a position teaching newly

5

hired employees how to repair pipelines in 1968, he did not provide them with any warnings about the dangers of asbestos. In 1970, Evans stopped doing hands-on work repairing pipe, although he still supervised contractors in the field for three more years; after that, he generally managed other inspectors, but he still worked as an inspector on very large jobs. Evans testified that if he had known asbestos was dangerous, he would have gone into a different line of work. He also testified that nothing in the SoCalGas specifications barred contractors from putting up caution signs, having employees wear protective gear, or doing air sampling to determine if asbestos was present.

Evans testified that beginning sometime in the mid-1980's, an epoxy coating, rather than asbestos, was used on pipes. He also said that in the 1990s when new piping was wrapped in epoxy, tie-ins to older pipes still involved removing asbestos. Harvey Kreitenberg, a master pipefitter expert called by the defense, testified that asbestos wrap was being phased out by the mid-1970's and an epoxy wrap was used instead. By the mid-1990's, Kreitenberg said, plastic piping was being used. Kreitenberg agreed that even when the new piping systems were in use, when workers tied in to older lines, the old pipe wrap would need to be removed.

After he retired from SoCalGas in 1990, Evans went to work for Cisco as a consultant to SoCalGas, and did the "same thing I did for the gas company. Inspect the pipeline that was being installed." Evans testified that while he was with Cisco in 1992, he supervised a project involving Hood in Los Angeles. Even then, he said, he was not aware of any dangers involving asbestos. No one at Cisco ever warned him about possible hazards of asbestos, and Cisco did not put up signs at the work site warning of asbestos.

Evans testified that the contractors who worked with SoCalGas "followed the specs right down the line. . . . They were experts. So am I. So was I back then." When asked for clarification, Evans said he was an expert at his job ensuring that pipeline was installed according to SoCalGas specifications, and the contractors were experts at their jobs installing gas pipelines. He also testified that the contractors were hired because

6

they were experts. Evans said that when he began working with Cisco, he was then in the role of contractor and expert in laying pipeline.

Evans was diagnosed with asbestosis in 2011, after experiencing shortness of breath when he walked.[1] He testified that now "[i]t's more difficult for me to breathe. I can't walk like I used to. I can't walk from here out on the street without help or a walker or oxygen. It's made quite a difference in my life, and I know from [the doctors] telling me it's not going to get any better and there's nothing they can do."

Plaintiffs' expert Dr. Reginald Abraham testified that asbestosis is caused when asbestos fibers get into the lungs, and "our body's natural reaction is to cover it up, seal it, contain it, try not to let it go anywhere else." As a result, the available surface area of the lungs is diminished because the damaged space cannot exchange carbon dioxide for oxygen, eventually leaving asbestosis patients starving for air and their organs suffering from lack of oxygen. Dr. Abraham testified that there is no known cure for asbestosis, and that it will shorten Evans's life.

Plaintiffs' public health expert Barry Castleman, Sc.D., testified that by the time Evans began working at SoCalGas in 1954, it was "well known in medical, industrial, and insurance circles" that exposure to asbestos was a health hazard. He also opined that contractors such as Hood would have information available to them about how to protect workers from dust hazards. Dr. Castleman testified that he did not know whether Hood or any other contractors actually had any information about the dangers of asbestos. On cross-examination, Dr. Castleman admitted that the general understanding through the 1970s was that as long as asbestos exposure was limited, it would not cause asbestosis in workers.

---

[1] Although the parties did not dispute that Evans had asbestosis, they did not agree about the extent to which his health limitations were caused by asbestosis or other medical issues. Because causation is not relevant on appeal, we have not included a discussion about the evidence on that subject here.

7

## B. Proceedings relating to Exhibit 4101

Plaintiffs called Larry Bruce Svatos, president and corporate designee of Hood Corporation, as an adverse witness pursuant to Evidence Code section 776. Svatos testified that Hood focused on underground utility construction from its founding in 1924 until it ceased operating in 2012. About half of Hood's business involved laying underground gas pipelines, and SoCalGas was a major client. Svatos testified that under Hood's document retention policy, all company documents more than ten years old are destroyed.

Svatos testified that Hood never warned employees about the hazards of asbestos exposure. No Hood employees ever received training about asbestos. Svatos knew pipe wrap as coal tar wrap; he had never heard it called asbestos wrap. Svatos testified that Hood first learned that pipe wrap contained asbestos in the mid-1980's when SoCalGas gave Hood notification to that effect. Before the mid-1980's, SoCalGas never provided any warnings about pipe wrap, valves, gaskets, or any other asbestos-containing materials. Hood therefore was unaware that SoCalGas had provided any asbestos materials to Hood before the mid-1980's. Plaintiffs' counsel contrasted this testimony with an interrogatory from an earlier case, in which Hood said it first became aware that there was an association between asbestos exposure and disease in the 1970s. Svatos testified that SoCalGas did not dictate whether Hood could provide its employees with respirators or other equipment that might protect them from the hazards of asbestos exposure.

Svatos testified that in a contract in the mid-1980's, SoCalGas instituted the "[100-]square foot rule." Under that procedure, when less than 100 square feet of pipe wrap was to be removed, Hood was supposed to spray it with an encapsulant provided by SoCalGas, remove the wrap, bag it, and give it to SoCalGas. For removal of pipe wrap greater than 100 square feet, Hood was supposed to contact SoCalGas for removal. SoCalGas first advised Hood that the pipe wrap may contain asbestos when the 100-square-foot rule was initiated. Svatos testified that SoCalGas told Hood that the asbestos in the pipe wrap was non-friable, or enclosed, and therefore not able to be released into

8

the atmosphere. Svatos believed that the 100-square-foot rule likely would have been in place when Evans worked on specific Hood jobs in the 1980's and 1990's.

Plaintiffs' counsel questioned Svatos at length about a sales brochure that listed numerous jobs Hood had done for SoCalGas from the 1970's to the 1980's. Counsel asked Svatos about a listing of 57 jobs in 1977, and Svatos responded, "Most likely they're referencing the crew hour work that we did under the blanket contract." Counsel asked Svatos to explain, and Svatos responded, "We had blanket contracts where the gas company just sent us jobs. We had hourly rates for labor and equipment, and we would go and do the job and bill them hourly." In another line of questioning, plaintiffs' counsel asked Svatos about how contracts for work were formed between Hood and SoCalGas, and Svatos replied that "[s]ome projects required a specific contract. Others were worked under the blanket contract." When asked for clarification, Svatos explained that the blanket contract was "[a]n agreement between Southern California Gas Company and the contractors to bid work per specific specifications for a time period so that a contract didn't have to be written for every single job." Svatos testified later that the blanket contracts were "generally more than 100 pages."

On examination by SoCalGas, Svatos testified that earlier blanket contracts were not available because of Hood's 10-year document retention policy, but said he had looked at a 2004 blanket agreement between the two companies—identified as Exhibit 4101—to refresh his recollection about the general provisions within those agreements. Plaintiffs' counsel objected to questioning about the 2004 contract, saying that the line of questioning was more prejudicial than probative, Hood had never produced the contract in discovery, Hood did not list it as a trial exhibit in pretrial filings, and the contract post-dated Evans's employment with SoCalGas. The court responded that the document was not being admitted as an exhibit, and said it would allow Svatos to answer questions about his recollection of previous contracts based on his refreshed recollection relating to the 2004 contract. Plaintiffs' counsel requested a "running objection . . . to every question that seeks to publish hearsay from this undisclosed document." Svatos testified the terms of the contract were generally similar to the terms in contracts he had seen

9

dating back to 1985. When defense counsel attempted to ask Svatos questions about specific provisions in the 2004 contract, plaintiffs' counsel objected. After confirming that the 2004 contract had not been listed on Hood's exhibit list, the court sustained plaintiffs' objection.

On re-direct, plaintiffs' counsel questioned Svatos extensively about Exhibit 4101. She asked whether the contract provisions regarding asbestos pipe wrap were the same in the 2004 contract as they were in the mid-1980's, and Svatos said that they were similar. Svatos agreed that the 100-square-foot rule would have been in both mid-1980's contracts as well as the 2004 contract. Plaintiffs' counsel asked to display the 100-square-foot rule in Exhibit 4101 to the jury, and the court allowed it. She read aloud a portion of the contract stating that the contractor—Hood—"shall limit the removal of asbestos containing material, ACM/coal tar base asbestos pipe wrap to 100 square feet or less." Counsel continued reading the contract's stated procedures for confining the asbestos and its disposition. Plaintiffs' counsel also read aloud portions of the contract stating that Hood was required to comply with OSHA regulations and other applicable laws, and that Hood was required to properly manage and dispose of hazardous materials. She read aloud long portions of the document stating that Hood was an independent contractor and responsible for control over the work performed, and Svatos agreed that this control "included the requirement for contractors to protect Southern California Gas employees who might be at that work site."

After a weekend break, plaintiffs' counsel again questioned Svatos about the contents of Exhibit 4101. When defense counsel again questioned Svatos, plaintiffs' counsel objected to questions about contracts between Hood and SoCalGas, saying that the testimony was "based on a document which was withheld in discovery," and she stated "a running objection . . . to all of these questions based on that discovery abuse." The court overruled the immediate objection. When defense counsel posed a question to Svatos based on a specific provision of the 2004 contract, plaintiffs' counsel objected that defendant was "just trying to publish what is otherwise an inadmissible document." The court overruled the objection.

Plaintiffs moved for a mistrial "based on the attorney misconduct" of Hood's counsel relating to Exhibit 4101. They argued that Exhibit 4101 was not disclosed in discovery and was not on Hood's exhibit list, and therefore Hood violated rules pertaining to discovery and trial disclosures. Counsel for Hood argued that the motion should be denied because the 2004 contract was used to refresh Svatos's recollection, and "I in no way sought to introduce any specific terms of the contract. . . . It was plaintiffs' counsel who elected to cross-examine Mr. Svatos on the express terms of the contract and publish them to the jury, which was not my intention at any time whatsoever." The court took the motion under submission. The court also held that Exhibit 4101 would not be admitted into evidence: "So the defense motion to introduce the blanket contract into evidence, No. 4101, will be denied over [*sic*] plaintiffs' objection."

The court denied plaintiffs' mistrial motion the following day. The court noted that Svatos testified that he used Exhibit 4101 to refresh his recollection, and counsel for plaintiffs "questioned the witness about several of the terms of the contract itself, after which defendant Hood Corporation questioned the witness about several additional terms." The court noted that Exhibit 4101 was not entered into evidence, and "[t]he court will grant leave to plaintiff[s] if they wish to submit a limiting instruction that the terms of the contract, which were published on the Elmo, should not be considered as the terms of any agreement between Southern California Gas and Hood Corporation during the time of plaintiff's employment with Southern California Gas, but only be considered as a document that was used to refresh recollection and provided evidence of a course of dealing which occurred between the parties at a particular period of time." The court concluded that it would be unlikely for the jury to be misled into thinking that the contract was relevant for the time period Evans was employed by SoCalGas, and therefore plaintiffs were not prejudiced by the introduction of the testimony. It does not appear that plaintiffs requested a special instruction relating to the contract.

C.     **Proceedings relating to Exhibits 101 and 102**

Plaintiffs' counsel also asked Svatos about plaintiffs' Exhibit 102, a document from the SoCalGas engineering department listing "specifications for materials and

11

components" for "pipe wrap, flood coater." Svatos agreed that the document was "consistent with the type of document specifications that [he] would review in connection with [his] work for Hood Corporation on jobs that concern Southern California Gas" and that it was "substantially identical to the type of specifications that [he] regularly worked with." Plaintiffs' counsel asked to admit Exhibit 102, and defense counsel objected based on hearsay, lack of foundation, and lack of authentication. The court sustained the objection on hearsay grounds.

Svatos testified that he saw specifications from SoCalGas that included the word asbestos relating to pipe wrap. But he also testified that by the time he began working at Hood in 1979, Hood was no longer using the type of pipe wrap included in the specifications included in Exhibit 102. Counsel later asked if Exhibit 102 was the "controlling specification for pipe wrap from 1980 through at least 1994." Svatos said in response to a question from the court that he was not able to answer that.

During a break outside the presence of the jury, the parties and the court discussed plaintiffs' planned proffer of Exhibit 101, a similar specification sheet for "pipe coating – shop applied." The court asked whether plaintiffs' counsel planned to ask similar questions about that document as she had with Exhibit 102, noting that counsel spent 45 minutes questioning Svatos about Exhibit 102. Plaintiffs' counsel said she was planning to lay a foundation to show that Exhibit 101 was a business record. She explained that while Hood claimed it did not know pipe wrap included asbestos, the specifications for pipe wrap said it included asbestos, and therefore it was not plausible that Hood would not know about the asbestos. The court expressed concern that the document was hearsay, and nothing connected the document to Hood specifically. Plaintiffs' counsel argued, "We are not offering this document as this point for the truth of the matter asserted. We are offering it on the issue of notice that Hood Corporation and other contractors who had this document . . . were notified that the materials that were used on the job were asbestos-containing." She also argued that it was intended to impeach Svatos, who, as Hood's corporate representative, said he did not know that the pipe wrap

12

contained asbestos. Plaintiffs' counsel also argued that even if it were hearsay, the specifications should fall under the business records exception.

Counsel for Lyles argued that for any specifications, an appropriate foundational showing would require a showing that the contractor received the document. Lyles's counsel also argued that to qualify for the hearsay exception, a business record must be made at or near the time of an event, and there was no such evidence here. The court agreed to take the admissibility of Exhibit 101 under consideration, and to reconsider its ruling on Exhibit 102.

Once Svatos was back on the witness stand, he testified that he never used the specifications in Exhibit 102. Svatos agreed that Exhibit 101 was "the type of format of document that [he] reviewed and used in [his] work throughout [his] career for Hood Corporation," but said he had never used Exhibit 101 specifically in his work. He was unable to say whether anyone at Hood had ever used Exhibit 101.

The court eventually ruled that Exhibits 101 and 102 were inadmissible. The court noted that plaintiffs asked that they be admitted for notice, but "the court finds that this notice is actually the truth of the matter being asserted in the exhibits, namely that the specifications called for asbestos materials, such as felt wrapping. . . . The court also finds that it is not admissible for notice because it has not been shown that the exhibits were ever given to any of the defendants." The court also referenced Evidence Code section 352, and said that "the relevance of the specification sheets is outweighed by possible prejudice."

Although the court's rejection of Exhibits 101 and 102 was not related to authenticity or hearsay, several days later counsel for plaintiffs argued again that Exhibits 101 and 102 should be admitted because the documents had been authenticated and were admissible as business records. Defense counsel pointed out that the documents were produced in depositions unrelated to this case. Defense counsel also noted that plaintiffs already had rested at that point, and suggested that they were improperly attempting to reopen their case. Plaintiffs' counsel stated that the documents included a letter of authentication saying they were directly from SoCalGas. The court denied plaintiffs'

13

renewed proffer, saying it would stand by its original ruling relating to Evidence Code section 352 and "[t]here was no indication that the defendants had ever received these specification notices."

## D. Closing arguments and jury instructions

While discussing which special instructions to give to the jury, the court considered ARB's Special Instruction No. 3, which stated that a construction contractor may not be held liable absent proof "that such company failed to exercise the ordinary skill and competence possessed and exercised by other construction contractors under similar circumstances." The instruction also stated that a reasonable practice under the circumstances was to be determined by "the actual or accepted practice in the construction field" during the relevant time period. The proposed instruction told the jury that it could "only determine the level of skill and care that a reasonable construction contractor company would use in similar circumstances based on the testimony of expert construction contractor witnesses who have testified in this case."

The court noted that Special Instruction No. 3 was similar to CACI No. 600 for professional negligence, which states that a professional is negligent if he or she fails to use the skill and care of a reasonably careful professional under similar circumstances.[2] (CACI No. 600.) Plaintiffs' counsel argued that CACI No. 600 was intended to be used for professionals such as doctors and lawyers, and "there is no construction contractor profession as such that's recognized as a different duty of care from ordinary duty of care." The court disagreed, noting that the case focused on very experienced pipe layers. The court said it would give CACI No. 600, "and I'll insert the words 'construction contractor' in the parenthetical portions of 600." Plaintiffs' counsel objected again for

---

[2] CACI No. 600 states in full, "[A/An] [insert type of professional] is negligent if [he/she] fails to use the skill and care that a reasonably careful [insert type of professional] would have used in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as 'the standard of care.' [¶] [You must determine the level of skill and care that a reasonably careful [insert type of professional] would use in similar circumstances based only on the testimony of the expert witnesses[, including [name of defendant],] who have testified in this case.]"

14

the record, arguing that the instruction "places an undue burden on the plaintiffs where the jury gets the impression we need to prove something more" than ordinary negligence. Counsel for defendant ARB noted that all parties also had agreed to give CACI No. 413, which states, "You may consider customs or practices in the community in deciding whether [defendant] acted reasonably. Customs and practices do not necessarily determine what a reasonable person would have done in [defendant]'s situation. They are only factors for you to consider." Plaintiffs' counsel responded, "I suggest that 413 be used in place of this altogether." The court confirmed that it would give both CACI Nos. 600 and 413.

The court then considered ARB's Special Instruction No. 5, which stated, in part, "An employer has a duty to furnish a place of employment that is safe and healthful for its employees. . . . The duty of the employer to provide a safe workplace cannot be delegated to other individuals or companies." Plaintiffs' counsel objected, arguing that the instruction was duplicative of CACI No. 400 regarding the standard of care in negligence cases, and CACI No. 411, which states that every person has a right to expect that every other person will use reasonable care. Plaintiffs' counsel also argued that defendants' duties to Evans were "unrelated to what his employer is doing or not doing." The court rejected these contentions, saying, "It's a statement of the law and I'll give it as requested."

The court also considered ARB's Special Instruction No. 12, which stated that to the extent the jury was considering customs and practices, it should "consider the customs and practices in place at the time . . . ARB or Hood acted." Plaintiffs' counsel objected that the instruction was too similar to CACI No. 413 to be helpful. Defense counsel argued that the special instruction made clear that the time period was relevant, so that past actions would not be compared to today's standards. The court agreed to give the instruction, saying that whether the defendants were negligent would be "defined by parameters . . . of time and place which 413 doesn't mention." The court also noted that CACI No. 413 "says that the instruction may be used if the standard of care is within common knowledge. You know, this certainly isn't a situation where the standard of care

15

is within common knowledge. Both sides had expert witnesses come in to explain to the jury in detail about the standard of care and what the state of the art was at a particular time." After the court modified it slightly, plaintiffs' counsel agreed that Special Instruction No. 12 should be given directly after CACI No. 413.

The court's jury instructions span about 18 pages of transcript. Within those instructions were the following:

"[ARB's Special Instruction No. 5]: An employer has the duty to furnish a place of employment that is safe and helpful [*sic*] to its employees. An employer has a duty to furnish and use safety devices, safeguards, practices, methods and processes that are reasonably adequate to render the workplace safe. An employer has a duty to do everything reasonably necessary to protect the life, safety, and health of its employees. The duty of the employer to provide a safe workplace cannot be delegated to other individuals or companies.

"[CACI No. 413:] You may consider customs or practices in the community in deciding whether Hood Corporation acted reasonably. Customs and practices do not necessarily determine what a reasonable person would have done in Hood Corporation's situation. They are only factors for you to consider. Following a custom or practice does not excuse conduct that is unreasonable. You should consider whether the custom or practice itself is reasonable.

"[ARB's Special Instruction No. 12:] In considering whether Hood Corporation complied with the customs or practices in their industry, you should consider the customs or practices in place at the time that Hood Corporation acted.

"[¶] . . . [¶]

"[CACI 600:] A construction contractor is negligent if it fails to use the skill and care that a reasonably careful construction contractor would have used in similar circumstances. This level of skill, knowledge, and care is sometimes referred to as the, quote, 'standard of care,' unquote. You must determine the level of skill and care that a reasonably careful construction contractor would use in similar circumstances based only on the testimony of the expert witnesses who have testified in this case."

16

The court also included instructions regarding the liability of other parties, including SoCalGas. The court listed the entities Hood alleged might be liable for Evans's injuries, and instructed the jurors, "If you find that the negligence of more than one person, including Hood Corporation and Kenneth Evans and the foregoing entities[,] was a substantial factor in causing Kenneth Evans' harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100 percent."

The parties gave closing arguments after the jury instructions. Plaintiffs' counsel argued, "The contractors were the experts on these work sites," and "Contractors were hired because they were experts in pipeline construction." Counsel also argued that Evans never saw anyone wearing protective gear, and if he had, he would have known that asbestos was dangerous: "[H]ad Mr. Evans shown up on a work site doing his job as an inspector . . . and saw this, he would have done something. It would have been a clue to him, a big one, that something is going on here that I don't think I want to be a part of or at least not without the Tyvek suit and the hood and the booties and, you know, the respirator. And there certainly weren't any barriers saying, 'Danger, asbestos.'"

Plaintiffs' counsel discussed the long history of medical literature regarding the dangerousness of asbestos, read from the OSHA regulations, and argued that there is no safe level of exposure to asbestos. She argued that the OSHA standards put employers on notice that asbestos was dangerous, "and it places a burden on employers, an obligation on employers, so they really knew about this stuff." Plaintiffs' counsel argued that Hood did not act reasonably because "[t]hey didn't tell anybody. They didn't warn anybody. They didn't use any respiratory protection for their own employees that would have alerted anybody else on site." Counsel also argued, "They could have tested the materials or the air. They could have engaged in medical monitoring of employees. They could have supplied respirators. They could have given their workers some training on the hazards of asbestos, but they never did – ever."

Counsel also read six different portions of unadmitted Exhibit 4101 to the jury, which she referred to as "the blanket contract that was in place after 1990." She argued

17

that the contract "puts the responsibility on the contractor" to maintain safety at the work site. She went on to say, "The contract placed the duty to protect against exposure to hazardous materials including asbestos on the contractor."

Hood's counsel began closing arguments by quoting Special Instruction No. 5, stating that an employer may not delegate employee safety to others, and argued that SoCalGas had a duty to ensure Evans's safety. He emphasized that SoCalGas was responsible for Evans's training, supervision, and all the materials supplied to the work sites. Defense counsel also argued that "we don't have any evidence that what Mr. Evans used actually contained . . . asbestos." He added that there are "no documents to show you from the Southern California Gas specifications what the content of any material was that was used by anyone. Again, why didn't they show that?" Defense counsel also discussed Exhibit 4101 briefly, noting that provisions to protect workers from asbestos were in place by the mid-1980's. Counsel pointed out that in all the time Evans worked with SoCalGas and various contractors, "Mr. Evans testified uniformly that nobody ever told him anything about asbestos. That includes all of these contractors. Nobody ever told him." He argued, "Is it reasonable to say that only Hood should have warned him when he had hundreds, if not thousands, of other jobs prior to that time?"

Hood's counsel also read CACI No. 600 about a reasonable contractor, and argued that Evans himself was a reasonable contractor when he worked for Cisco in the 1990's. Even then, counsel argued, Evans did not warn anyone about the possible hazards of asbestos exposure: "Conduct is negligent only where some unreasonable risk of danger to others would have been foreseen by a reasonable person. Well, I think we can all agree that Mr. Evans is a reasonable person. He didn't foresee the dangers of asbestos by 1991, '92, or '93. They're telling you Hood should have foreseen the dangers of asbestos by 1960."

Following plaintiffs' rebuttal and final instructions, the jury began deliberations. The verdict form included the following: "Question No. 1: Was plaintiff Kenneth Evans exposed to asbestos by Hood Corporation's conduct?" and "Question No. 2: Was Hood Corporation negligent?" The next day, the jury sent a note stating, "We agree on

18

question 1, but we are hung up on question 2." The court called the jury back to the courtroom, and read them CACI No. 400, which sets out the elements of negligence, and CACI No. 401, the instruction on basic standard of care.[3]

The following morning, the jury returned with a verdict. By a count of nine to three, the jury found that Evans was exposed to asbestos as a result of Hood Corporation's conduct. Also by a count of nine to three, the jury found that Hood was not negligent.

Judgment in favor of Hood was entered and plaintiffs timely appealed.

## DISCUSSION

### A.     Evidentiary rulings

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion." (*Pannu v. Land Rover North America, Inc*. (2011) 191 Cal.App.4th 1298, 1317.) "[T]he trial court is vested with broad discretion in ruling on the admissibility of evidence, and its ruling will be upset only upon a clear showing that it exceeded the bounds of reason." (*Professional Engineers in California Government v. Brown* (2014) 229 Cal.App.4th 861, 875.) In addition, a "trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a 'miscarriage of justice'—that is, that a different result would have been probable if the error had not occurred." (*Zhou v. Unisource Worldwide, Inc*. (2007) 157 Cal.App.4th 1471, 1480 (*Zhou*).)

---

[3] For this case, CACI No. 400 was as follows: "Kenneth Evans claims that he was harmed by Hood Corporation's negligence. To establish this claim, Kenneth Evans must prove all of the following: One, that Hood Corporation was negligent. Two, that Kenneth Evans was harmed. And, three, that Hood Corporation's negligence was a substantial factor in causing Kenneth Evans' harm." CACI No. 401 stated, "Negligence is the failure to use reasonable care to prevent harm to oneself or to others. A person can be negligent by acting or by failing to act. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation. You must decide how a reasonably careful person would have acted in Hood Corporation's situation."

19

### 1.    *Testimony about Exhibit 4101*

Plaintiffs argue that the "trial court's admission of Hood's Trial Exhibit 4101" was erroneous.  They assert that "exhibit 4101 was completely irrelevant and the trial court had no discretion to admit it" because the 2004 contract was dated long after Evans's employment with SoCalGas ended, and decades after SoCalGas stopped using asbestos-containing pipe wrap.  Plaintiffs also argue that the trial court "erred in refusing to exclude [Exhibit 4101] despite the fact that Hood had never produced it during discovery, nor had Hood listed the contract on its exhibit list."  They conclude that "the admission of the contract and its terms was highly prejudicial to plaintiffs and reversal on the basis that its admission was an abuse of discretion is warranted."

Our review of the record indicates that Exhibit 4101 was not admitted at trial.  Hood asked to have it admitted as an exhibit, and the court denied the request: "So the defense motion to introduce the blanket contract into evidence, No. 4101, will be denied."  Plaintiffs' arguments that the trial court abused its discretion by admitting the document, and that the court erred because it had no discretion to admit the document, therefore are factually incorrect.

Plaintiffs also argue that the trial court should not have allowed Svatos to testify about the contents of the 2004 contract.  They argue that "Svatos was allowed to extensively testify" about Exhibit 4101, and this testimony "about the '100-square-foot rule' and the other purported duties imposed on [SoCalGas] under the 2004 contract [misled] the jury into believing that SCG" was responsible for Evans's asbestosis.

Hood correctly points out that defense counsel did not question Svatos about the contents of the 2004 contract.  Instead, counsel asked Svatos whether he reviewed the 2004 contract to refresh his recollection about similar provisions in earlier contracts.  When Hood's counsel attempted to ask Svatos questions about specific provisions of the 2004 contract, the trial court sustained plaintiffs' objection.  On re-direct, however, plaintiffs' counsel asked Svatos extensive questions about the 2004 contract, read numerous portions of the contract aloud and displayed the provisions on the Elmo screen for the jury.  Hood now argues that plaintiffs' arguments about Svatos's testimony are

20

"waived or invited error.  Counsel for [plaintiffs] brought this exhibit into issue, not Hood."

First, we consider whether the 2004 contract was appropriate to refresh Svatos's recollection.  Evidence Code section 771, subdivision (a), states, "[I]f a witness, either while testifying or prior thereto, uses a writing to refresh his memory with respect to any matter about which he testifies, such writing must be produced at the hearing at the request of an adverse party and, unless the writing is so produced, the testimony of the witness concerning such matter shall be stricken."  Here, this is exactly what occurred— Svatos used the 2004 contract to refresh his recollection about earlier contracts, and counsel produced the 2004 contract at the hearing when it was established that the document was used to refresh Svatos's recollection.

Evidence Code section 771, subdivision (b) provides that, "If the writing is produced at the hearing, the adverse party may, if he chooses, inspect the writing, cross-examine the witness concerning it, and introduce in evidence such portion of it as may be pertinent to the testimony of the witness."  This also occurred here.  Hood was barred from questioning Svatos about the terms of the 2004 contract, but the adverse party— plaintiffs—questioned Svatos about the document, and through Svatos's testimony, introduced portions of it to the jury.  (See, e.g., *People v. Lee* (1990) 219 Cal.App.3d 829, 840 ["where a writing is used to refresh recollection, *the adverse party* can introduce relevant portions of it into evidence under section 771, but the examining party may not."].)  The trial court therefore did not err in its ruling on the 2004 contract.

Second, plaintiffs argue that use of the 2004 contract at trial blindsided them because the document was never produced in discovery or listed on Hood's trial exhibit list.  According to plaintiffs, "Hood's conduct constitutes a willful withholding of evidence; and the trial court abused its discretion in permitting Hood to allow any reference to that exhibit, let alone extensive testimony about its terms."  As noted above, however, the extensive testimony about the document's terms was a result of plaintiffs' counsel's questioning, not Hood's.

21

Plaintiffs cite no authority stating that a document used to refresh a witness's recollection must be disclosed in discovery or included in a trial exhibit list. To the contrary, Evidence Code section 771, discussed above, anticipates that a document used to refresh a witness's recollection will be produced at the hearing in which the witness is testifying. (Evid. Code, § 771, subd. (a).) In addition, documents used to refresh a witness's recollection need not be admissible, and indeed are inadmissible under Evidence Code section 771, subdivision (b), except when proffered by the adverse party. (See, e.g., *People v. Lee*, *supra*, 219 Cal.App.3d at p. 840 ["'The writing is used by the witness solely to assist him in giving his oral testimony. It has no independent evidentiary value for the party calling him, and is not admissible in evidence at his instance.' [Citation.]"].) Plaintiffs offer no explanation as to why such a document should have been listed as a party's trial exhibit.

Plaintiffs cite *Thoren v. Johnston & Washer* (1972) 29 Cal.App.3d 270 in support of their argument, but that case is distinguishable. There, the defendants first discovered during opening statements that the plaintiff planned to put on a witness who had not been disclosed before trial. The trial court found that the plaintiffs' exclusion of the witness's name from discovery responses was willful, and excluded the witness's testimony. (*Thoren, supra*, at p. 273.) The Court of Appeal affirmed, finding that "[t]here is substantial evidence supporting the trial court's finding that appellant's answer to interrogatory B-2 was willfully false." (*Id*. at p. 275.) Here, the court made no such finding. Moreover, the document was used only to refresh Svatos's recollection until counsel for plaintiffs began questioning Svatos about specific provisions in the 2004 contract. The situation here was therefore unlike that in *Thoren*, and the reasoning there does not support a finding of error.

Even if we were to find the court erred by allowing defendants to use Exhibit 4101 to refresh Svatos's recollection, any such error was harmless. Plaintiffs argue it was prejudicial, but they do not articulate why; they simply refer back to the prejudice

22

arguments relating to the jury instructions they allege were erroneous.[4]  Moreover, plaintiffs' counsel used Exhibit 4101 to plaintiffs' advantage, questioning Svatos about contract provisions stating that asbestos was in the pipe wrap and the contractor should employ certain precautions when working with asbestos.  Plaintiffs' counsel also focused on the contract in closing arguments, suggesting that plaintiffs found it to be valuable to their case.  Although the court invited plaintiffs to submit a limiting instruction relating to Exhibit 4101, it does not appear that plaintiffs ever submitted one.  Nonetheless, the evidence before the jury made clear that Exhibit 4101 was a 2004 document, and that all the contracts from the time Evans said he worked with Hood had been destroyed, therefore minimizing any confusion about the relevance of the document.  There is no indication that a different result would have been probable had the court excluded all references to Exhibit 4101.  (See *Zhou, supra,* 157 Cal.App.4th at p. 1480.)

      2.    *Exclusion of Exhibits 101 and 102*

Plaintiffs also argue that the trial court erred by refusing to admit two SoCalGas specification documents—Exhibit 101, dated 1977, and Exhibit 102, dated 1994—"each of which specifically disclosed that the covering on the pipes used by [SoCalGas] contained asbestos."  Plaintiffs note Svatos's testimony that SoCalGas did not provide information about asbestos in pipe wrap in use before the 1980's, other than his statement that the specification sheets looked similar to ones he had received in the past from SoCalGas.  Plaintiffs contend that the specifications were not being offered for the truth of the matter asserted—that the pipe wrap indeed contained asbestos—but rather to show that Hood had notice that the pipe wrap contained asbestos.

---

[4] This section of plaintiffs' opening brief provides no citation to any relevant authority in support of their arguments.  Both parties' briefs are similarly lacking in several parts of their legal argument sections.  We remind counsel that each appellate brief must "support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)  And because neither party cited to volume numbers for the 15-volume reporter's transcript, we remind counsel that appellate briefs must "[s]upport any reference to a matter in the record by a citation to *the volume and page number of the record where the matter appears.*"  (Cal. Rules of Court, rule 8.204(a)(1)(C).)

Svatos testified that although Exhibits 101 and 102 looked similar to specifications Hood used, he never actually used or witnessed the specifications in either document. Plaintiffs therefore did not present any evidence that Hood received or relied on these specifications. Plaintiffs argue, "Whether plaintiffs were able to demonstrate that Hood saw *this particular* specification is irrelevant. *The mere existence* of such a specification in use during the relevant time period, by the company whose specifications Hood asserts it relied on, has at least some tendency to prove that Hood should have known the product contained asbestos." The trial court did not abuse its discretion by declining to admit these documents.

"An out-of-court statement [may be] properly admitted for a relevant non-hearsay purpose, such as to show a warning, admonition, or notice," if the statement is "'significant irrespective of the truth or falsity of its content.'" (*Caro v. Smith* (1997) 59 Cal.App.4th 725, 733.) Thus, "an out-of-court statement can be admitted for the nonhearsay purpose of showing that it imparted certain information to the hearer," but the "nonhearsay purpose must also be relevant to an issue in dispute." (*People v. Montes* (2014) 58 Cal.4th 809, 863.)

Although plaintiffs offered these exhibits for the nonhearsay purpose of proving notice to Hood that pipe wrap contained asbestos, the testimony did not establish that Hood ever received these documents. As the court pointed out in denying plaintiffs' proffer, "[I]t has not been shown that the exhibits were ever given to any of the defendants." Plaintiffs' reasoning about the documents' potential notice to Hood requires three assumptions that were unsupported by any other evidence. First, these specifications mentioned asbestos, and plaintiffs would have the jury assume that other specifications (which were not exhibits at trial) also must have mentioned asbestos. Second, Svatos testified that Hood had received similar-looking specifications relating to work with SoCalGas, and plaintiffs would have the jury assume that Hood must have received some of those non-exhibit specifications that mention asbestos. Third, Svatos testified that after the 1980's Hood already knew about the asbestos in the pipe wrap. In order to be relevant and non-duplicative, plaintiffs would have the jury assume that the

24

non-exhibit specifications mentioning asbestos must have reached Hood in a time period before the 1980's. If the jury were to conclude that all three of those assumptions were true, it could conclude that Hood had notice that the pipe wrap contained asbestos earlier than the 1980's, as plaintiffs assert. However, because plaintiffs did not present evidence to support those assumptions, these gaps in foundational evidence were far too broad to support the admission of Exhibits 101 and 102. For the jury to "reach that conclusion would be to 'fling a plank of hypothesis over an abyss of uncertainty.'" (*Gradus v. Hanson Aviation, Inc*. (1984) 158 Cal.App.3d 1038, 1056, quoting *The Descent of Man*, The Collected Short Stories of Edith Wharton, Volume 1, Edited by R.W.B. Lewis.)

Plaintiffs also argue that the court erred by excluding Exhibits 101 and 102 on the basis that they would be more prejudicial than probative. (Evid. Code, § 352.) The court stated that "the relevance of the specification sheets is outweighed by possible prejudice" because "the jurors will consider the specifications with regard to . . . a particular agreement with the parties." Plaintiffs argue that "[t]he only 'prejudicial' effect of that evidence was to prove Hood's liability." But as discussed above, the probative value of the evidence was minimal because the evidence did not show that Hood received Exhibits 101 and 102. Furthermore, the court did not abuse its discretion in finding that the jury might be confused about the relevance of Exhibits 101 and 102, and mistake them for specifications relating directly to Hood's work with SoCalGas. "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) The court's assessment of the jury's potential confusion was not palpably arbitrary, capricious, or patently absurd, and therefore we find no error.

## B.      Jury Instructions

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).)  We  review the legal adequacy of jury instructions under the de novo standard of review.  (*Davis v. Honeywell International Inc.* (2016) 245 Cal.App.4th 477, 495; *Isip v. Mercedes-Benz USA, LLC* (2007) 155 Cal.App.4th 19, 24.)

"[I]nstructional error in a civil case is not grounds for reversal unless it is probable the error prejudicially affected the verdict."  (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217.)  Thus, "[i]n addition to showing an instructional error occurred, an appellant must establish the error was prejudicial."  (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 617.)  "In assessing prejudice from an erroneous instruction, we consider, insofar as relevant, '(1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].'  [Citation.]"  (*Soule, supra,* 8 Cal.4th at pp. 570-571.)

### 1.      *Special Instruction No. 5 regarding an employer's duty*

Plaintiffs argue that the trial court erred by giving ARB's Special Instruction No. 5, stating that an employer has a non-delegable duty to create a safe workplace for employees.  Although plaintiffs agree that SoCalGas, as Evans's employer, had a duty to provide Evans with a safe and healthful workplace, they do not agree that the duty was non-delegable.  By telling the jury that SoCalGas's duty was non-delegable, plaintiffs argue, the instruction "essentially abrogated any potential for liability on Hood's part" by suggesting that only SoCalGas could be liable for Evans's exposure.

Hood does not argue that this instruction was legally correct, nor does it address the authorities plaintiffs cite.  Instead, Hood argues that the evidence presented at trial "support[s] a claim by the co-defendants that SoCalGas was, to some or all extent,

26

responsible for his exposure." Hood has not cited any authority regarding an employer's or contractor's duty of care, except to note in the fact section of its brief that when ARB's proposed jury instruction was submitted to the court below, ARB cited several sources as authority. In short, Hood argues that the evidence supports the verdict, but it does not contend that the law supports the jury instruction. Nonetheless, the propriety of a jury instruction is a question of law (*Harb v. City of Bakersfield, supra,* 233 Cal.App.4th at p. 617), which we must consider de novo.

The instruction at issue was as follows: "An employer has the duty to furnish a place of employment that is safe and helpful [sic: healthful] to its employees. An employer has a duty to furnish and use safety devices, safeguards, practices, methods and processes that are reasonably adequate to protect the life, safety, and health of its employees. The duty of the employer to provide a safe workplace cannot be delegated to other individuals or companies."

The first sentence of the instruction comes from Labor Code section 6400, subdivision (a): "Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein." In addition, it is a correct statement of the law that "[e]mployers have a nondelegable duty to furnish their employees with a safe place to work." (*Waste Management Inc. v. Superior Court* (2004) 119 Cal.App.4th 105, 110.)

Plaintiffs argue, however, that "as between the employer and employee, the duty is non-delegable . . . , but that does not mean that a third party who concurrently contributes to the injury cannot be held responsible." They cite *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590 (*SeaBright*) in support of their argument, in which the Supreme Court considered the duties of an independent contractor and the party that hired the independent contractor (the hirer) to the contractor's employees. The hirer was US Airways, which hired contractor Lloyd W. Aubry Co. to maintain and repair a luggage conveyer at San Francisco International Airport. (*Id.* at p. 594.) One of Aubry's employees was injured while inspecting the conveyor, and after the workers' compensation insurer paid benefits to the worker, the insurance company sued US

27

Airways to recover the benefits paid to the worker. (*Id*. at pp. 594-595.) The worker intervened as a plaintiff in the action, claiming negligence and premises liability. (*Id*. at p. 595.)

Thus the situation in *SeaBright* is different than the one here, because Evans was an employee of the hirer, not the contractor. Nevertheless, the Supreme Court's introductory statements in *SeaBright* are relevant: "By hiring an independent contractor, the hirer implicitly delegates to the contractor any tort law duty it owes *to the contractor's employees* to ensure the safety of the specific workplace that is the subject of the contract. That implicit delegation includes any tort law duty the hirer owes to the contractor's employees to comply with applicable statutory or regulatory safety requirements. Such delegation does not include the tort law duty the hirer owes *to its own employees* to comply with the same safety requirements . . . ." (*Id*. at p. 594 [emphasis in original].) Later in the opinion, the Court stated, "Before hiring independent contractor Aubry, defendant US Airways owed *its own* employees a duty to provide a safe workplace. We do not suggest that defendant could delegate *that* preexisting duty to Aubry (such that defendant could avoid liability if the conveyor had injured *defendant's own* employee)." (*Id*. at p. 603 [emphasis in original].) *SeaBright* therefore supports the conclusion that when a hirer such as SoCalGas delegates work to a contractor such as Hood, it has not delegated "the tort law duty the hirer [SoCalGas] owes *to its own employees*." The trial court's instruction about delegation—"The duty of the employer to provide a safe workplace cannot be delegated to other individuals or companies"—therefore appears to be a correct statement of law.

Plaintiffs cite portions of the *SeaBright* opinion discussing the "presumption that an independent contractor's hirer delegates to that contractor the responsibility to perform the specified work safely." (*Id*. at p. 601-602.) But this discussion occurred in the context of the case, in which the Court "reject[ed] the premise that the tort law duty, if any, that a hirer owes under Cal–OSHA and its regulations to the employees of an independent contractor is nondelegable." (*Id*. at p. 601.) Here, the question is not what duties a hirer has to the employees of a contractor, but instead what duties a hirer has to

28

its own employees when a contractor also happens to be working at the job site. Indeed, the court noted that following changes to employment laws in 1971, "we have never held *under the present law* that a specific Cal–OSHA requirement creates a duty of care to a party that is not the defendant's own employee." (*Id*. at p. 597.) *SeaBright* did not change that, and that case does not support plaintiffs' argument that SoCalGas's duties to Evans were delegated, even in part, to Hood.

Plaintiffs also rely on several authorities for the proposition that entities other than an employer may be liable for a work-related injury. For example, plaintiffs argue that Labor Code section 6400, subdivision (b) suggests that both an employer/hirer and a contractor may be liable for injuries arising from the "multiemployer worksites" such as the ones at issue in this case. Plaintiffs cite *Bonner v. Workers' Comp. Appeals Bd*. (1990) 225 Cal.App.3d 1023, a worker's compensation case in which the Court of Appeal held that both an employer and a premises owner could be liable for a slip-and-fall accident where both defendants were aware that spilled soap made the floor slippery. They also rely on *Kuntz v. Del E. Webb Const. Co*. (1961) 57 Cal.2d 100, in which the Court held that if a general contractor knows about a dangerous situation it may be liable for injuries to a subcontractor's employees, but it was error to instruct the jury that the law presumes that the contractor knew of the dangerous condition.[5]

None of these authorities lead us to the conclusion that Special Instruction No. 5 was legally erroneous. While plaintiffs are correct that both an employer and a third party may be liable for an employee's injury, nothing in Special Instruction No. 5 suggested to the jury that a third party *cannot* be liable. Indeed, the entire focus of the

---

[5] At oral argument, plaintiffs' counsel argued that *Kuntz* definitively requires that the verdict be reversed. We disagree. *Kuntz*, a 55-year-old case decided before significant changes in the Labor Code were enacted, held only that an expansive definition of "employer" in the former version of Labor Code 6304 should not be construed to impose liability on a general contractor for injuries to the employee of a subcontractor, where the general contractor did not play a significant role in overseeing the safety of the subcontractors' workers. Nothing in *Kuntz* contradicts the current version of Labor Code 6400, nor does it hold that an employer's duty to its own employees is not delegable.

29

trial was whether a third party—Hood—was liable to Evans. The jury was instructed to determine that issue, therefore making clear that Hood could be held liable. Moreover, the jury was instructed that if it found Hood negligent, it could attribute some or all of the fault to other entities, including SoCalGas, further indicating that multiple parties could be liable for Evans's injuries.

Even if the instruction were an erroneous statement of the law, plaintiffs have not demonstrated that there is a reasonable probability that in the absence of the error, the jury would have reached a result more favorable to plaintiffs. Considering the first *Soule* prejudice factor, there was little conflict in the evidence on critical issues. The roles of the employer and contractor were clear, the testimony about the work that was done in Evans's presence was generally consistent, there was no dispute that Evans had been exposed to asbestos and contracted asbestosis as a result, and there was little dispute that no one at Evans's work sites, whether employed by SoCalGas or Hood, took measures to protect workers from asbestos exposure. Second, Hood's argument to the jury did not contribute to any misleading effect of the instruction, because it was a correct statement of the law and the entire trial focused on whether Hood was partially responsible for Evans's exposure. Third, the jury never requested a rereading of the instruction. Instead, the jury told the court that it agreed on the first question (whether Evans was exposed to asbestos as a result of Hood's conduct), but it was stalled on the second question (whether Hood was negligent). After the court repeated the basic instructions regarding negligence and standard of care, the jury reached a verdict, finding that Hood was not negligent. There is nothing in the record indicating that the jury was confused about whether Hood could be liable in light of SoCalGas's role. Fourth, the verdict was a close nine-to-three, the only factor that weighs in favor of plaintiffs. Finally, other instructions made clear to the jury that its role was to determine the extent to which Hood was liable for Evans's exposure. Far from telling the jury that only SoCalGas could be liable, the thrust of the entire set of instructions advised the jury how to determine whether Hood was liable and if so, how to determine damages. "Absent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict

30

reflects the legal limitations those instructions imposed' [citations]." (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804.)

We therefore find that the jury instruction was not an erroneous statement of the law, and even if it were, plaintiffs have not demonstrated that they were prejudiced by any such error.

### 2. *CACI No. 600 regarding the professional standard of care*

Plaintiffs also argue that the court "impos[ed] an unreasonable negligence standard on plaintiffs" by including CACI No. 600 regarding the professional standard of care in the jury instructions. Plaintiffs argue that this instruction does not apply in an ordinary negligence case such as this one, and "laying pipe is not a 'profession' in the sense that a standard of care other than ordinary negligence should have applied." Plaintiffs cite no authority supporting their argument that the instruction was legally incorrect; they have not cited any cases, treatises, or other authority discussing when a "professional" standard of care applies, compared to when an ordinary negligence standard applies. Plaintiffs cite only the language of CACI Nos. 413 and 600 and the use note for CACI 413, and conclude that CACI No. 600 does not apply.[6] "[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles." (*People v. Morales* (2001) 25 Cal.4th 34, 48 fn. 7.)

California case law suggests that such an instruction was acceptable in the context of this case. In general, "'negligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm.' (Rest.2d Torts, § 282.) Thus, as a general proposition one 'is required to exercise the

---

[6] Again, Hood does not assert that the instruction was legally correct or cite any legal authorities in support of this instruction. Instead, Hood merely points out that ARB's Special Instruction No. 3 (which the court replaced with CACI No. 600) was submitted to the trial court with a list of supporting authorities. Hood also states in this section that in one case upon which plaintiffs rely in their argument relating to Special Instruction No. 5, the court found that an erroneous medical malpractice instruction was harmless.

care that a person of ordinary prudence would exercise under the circumstances.' [Citations.]  Because application of this principle is inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances.  [Citation.]" (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997 (*Flowers*).)

Plaintiffs' argument that CACI No. 600 altered their burden of proof is misguided in that it assumes that a "professional" standard of care is inherently different than the standard in ordinary negligence cases.  It is not.  "With respect to professionals, their specialized education and training do not serve to impose an increased duty of care but rather are considered additional 'circumstances' relevant to an overall assessment of what constitutes 'ordinary prudence' in a particular situation." (*Flowers*, *supra*, 8 Cal.4th at pp. 997-998.)  "Since the standard of care remains constant in terms of 'ordinary prudence,' it is clear that denominating a cause of action as one for 'professional negligence' does not transmute its underlying character.  For substantive purposes, it merely serves to establish the basis by which 'ordinary prudence' will be calculated and the defendant's conduct evaluated." (*Flowers*, *supra*, 8 Cal.4th at p. 998.)

Plaintiffs argue that "laying pipe is not a 'profession.'"  However, case law, statutes, and secondary sources suggest that the scope of those held to a "professional" standard of care—a standard of care similar to others in their profession, as opposed to that of a "reasonable person"—is broad enough to encompass a wide range of specialized skills.  As a general matter, "[t]hose undertaking to render expert services in the practice of a profession or trade are required to have and apply the skill, knowledge and competence ordinarily possessed by their fellow practitioners under similar circumstances, and failure to do so subjects them to liability for negligence." (*Estate of Beach* (1975) 15 Cal.3d 623, 635.)  The Restatement Second of Torts, section 299A, states, "Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to

32

exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." This provision applies "to any person who undertakes to render services to others in the practice of a skilled trade, such as that of airplane pilot, precision machinist, electrician, carpenter, blacksmith, or plumber." (Rest.2d Torts, § 299, com. b, p. 73) The Restatement Third of Torts states, "If an actor has skills or knowledge that exceed those possessed by most others, these skills or knowledge are circumstances to be taken into account in determining whether the actor has behaved as a reasonably careful person." (Rest.3d Torts, § 12.)

For example, non-specialist medical practitioners must use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical practitioners of the same type would use in similar circumstances (see, e.g., CACI No. 501), while medical specialists must use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical specialists of the same type would use in similar circumstances (see, e.g., CACI No. 502). Similarly, an attorney must use "such skill, prudence, and diligence as members of his or her profession commonly possess and exercise." (*Moua v. Pittullo, Howington, Barker, Abernathy, LLP* (2014) 228 Cal.App.4th 107, 112.) "If [the attorney] further specializes within the profession, he must meet the standards of knowledge and skill of such specialists." (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 188.) "[A] psychotherapist or other mental health care provider has a duty to use a reasonable degree of skill, knowledge and care in treating a patient, commensurate with that possessed and exercised by others practicing within that specialty in the professional community." (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 505.) In product liability cases, a negligence cause of action "requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." (*Anderson v. Owens-Corning Fiberglas Corp*. (1991) 53 Cal.3d 987, 1002.) A home inspector must "conduct a home inspection with the degree of care that a reasonably prudent home inspector would exercise." (Bus. & Prof. Code, § 7196.) A blood bank

must "exercise with respect to blood testing and donor screening 'that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised' by other blood banks 'under similar circumstances.' [Citation.]" (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 272.) One who holds himself out as an expert soil tester must "exercise the ordinary skill and competence of those in the business of soil testing," because experts who possess special skills "have a duty to exercise the ordinary skill and competence of members of their profession, and a failure to discharge that duty will subject them to liability for negligence." (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 489-490.)

The evidence in this case revolved around specialized contractors and specialized gas company employees who made entire careers of doing the highly specific work of building and repairing gas pipelines. Evans himself testified that the defendant contractors are experts in laying gas pipelines, and that by the time he worked for Cisco he was also an expert at laying pipelines. Svatos testified that for nearly 90 years, Hood Corporation's entire business was focused on underground utility construction, about half of which involved building gas pipelines. Plaintiffs' expert Ay testified about the duties of a contractor under these circumstances. In discussing jury instructions, the court remarked, "You know, this certainly isn't a situation where the standard of care is within common knowledge. Both sides had expert witnesses come in to explain to the jury in detail about the standard of care and what the state of the art was at a particular time." Given the extensive evidence in this case about the very specialized profession of building and repairing gas pipelines, the court did not err by instructing the jury that Hood had a duty to use the skill, knowledge, and care that a reasonably careful construction contractor would have used in similar circumstances.

Plaintiffs argue that "the real problem with this instruction is that it told the jury that so long as Hood did what other contractors were doing, it was acting within the standard of care and was not negligent." In fact, the jury was instructed exactly the opposite. The court gave CACI No. 413: "You may consider customs or practices in the community in deciding whether Hood Corporation acted reasonably. Customs and

34

practices do not necessarily determine what a reasonable person would have done in Hood Corporation's situation. They are only factors for you to consider. Following a custom or practice does not excuse conduct that is unreasonable. You should consider whether the custom or practice itself is reasonable." Our duty is to "look at the instructions as a whole, not in isolation, and we must assume jurors are able to correlate, follow, and understand the court's instructions." (*Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 467.) There is no indication that the jury failed to understand or follow CACI No. 413 here.

Plaintiffs argue that CACI Nos. 413 and 600 necessarily conflict, and point out that the use notes for CACI No. 413 say, "An instruction stating that evidence of custom is not controlling on the issue of standard of care should not be given in professional malpractice cases in which expert testimony is used to set the standard of care." The use notes cite *Osborn, supra,* 5 Cal.App.4th 234, which held that the blood blank "cannot be found negligent for failing to perform tests that no other blood bank in the nation was using." (*Id*. at p. 282.) The court reasoned that "in cases like ours where experts are needed to show negligence, their testimony sets the standard of care" and "'when the matter in issue is within the knowledge of experts only and not within common knowledge, expert evidence is conclusive and cannot be disregarded.'" (*Id*. at p. 277.)

To the extent CACI Nos. 413 and 600 can be deemed incompatible, any error likely worked in plaintiffs' favor. All evidence, including the testimony of Evans himself, indicated that at the times Evans was working on gas pipelines, neither SoCalGas nor Hood nor Cisco was employing the use of protective gear, signage, or warnings to employees about the dangers of asbestos in pipe wrap. Under the reasoning of *Osborn*, that testimony would have been conclusive as to the standard of care in this case. Here, however, the court gave the additional instruction in CACI No. 413, telling the jury that custom and usage were not controlling, and that they should consider whether the typical practices at Evans's worksites were reasonable. Plaintiffs also argue that CACI No. 413 should have been given alone, but as we have discussed we do not

35

find that giving CACI No. 600, either alone or in conjunction with CACI No. 413, was error under the circumstances of this case.

Plaintiffs argue that they were prejudiced by the use of CACI No. 600, but application of the *Soule* factors does not lead to a finding of prejudice. Plaintiffs admit there was no conflict in the evidence about custom and practice in the industry, because none of the contractors nor SoCalGas employed asbestos protection for workers. Plaintiffs also argue that they were prejudiced because "they did not call a 'professional' pipeline contractor to testify." Plaintiffs' expert Charles Ay, however, testified that he was familiar with how contractors such as Hood worked, and he testified about their duties to keep employees and others safe. The court rejected defendants' proposed special instruction language that the jury was required to rely on "expert construction contractor witnesses that who have testified in this case," and instead used CACI 600 language instructing the jury to rely on "the testimony of the expert witnesses who have testified in this case." Thus, there was no suggestion from the court that the jury was required to rely on any particular type of expert testimony. In addition, plaintiffs did not object to the trial court that they were limited in the type of expert testimony they were allowed to present. In short, there is no indication that plaintiffs' case suffered for lack of a different type of expert.

Considering the additional *Soule* factors, Hood's argument did not mislead the jury, the jury did not request a rereading of the instruction, and the remaining instructions were clear about the standards for negligence. The verdict was close—nine to three. But after the jury announced that it was deadlocked, the court read the standard negligence instructions to the jury again (CACI Nos. 400 and 401), and the jury was able to resolve its deadlock thereafter. There is no indication that the use of CACI No. 600, even if erroneous, prejudiced plaintiffs in a manner that would warrant reversal.

## C. Cumulative error

Plaintiffs argue that the cumulative effect of the court's errors warrants a new trial. Because we find no individual errors, the cumulative error doctrine does not apply. (See

36

*Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235, 1246 ["Since there is no error in these individual rulings, there is, of course, no cumulative error."].)

**DISPOSITION**

The judgment is affirmed.  Hood is entitled to its costs on appeal.

**CERTIFIED FOR PUBLICATION**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.