[No. B163974. Second Dist., Div. Four. May 24, 2004.]

AZUBUEZE JIAGBOGU, Plaintiff and Respondent, v.
MERCEDES-BENZ USA, Defendant and Appellant.

**1238**

---

#### COUNSEL

Bannan, Green, Frank & Terzian, Ronald F. Frank, Jemal K. Yarbrough and Peter S. Sessions for Defendant and Appellant.

Norman Taylor & Associates and Rene Korper for Plaintiff and Respondent.

---

#### OPINION

**EPSTEIN, Acting P. J.**—Defendant Mercedes-Benz USA, Inc. (MBUSA) appeals from a judgment in favor of plaintiff Azubueze Jiagbogu in an action for breach of express and implied warranties under the Song-Beverly Consumer Warranty Act (Act) (Civ. Code, §§ 1790–1795.7). (All further statutory references are to the Civil Code unless otherwise specified.) MBUSA argues the trial court erred by not instructing on waiver of right to rescind, on statutory offsets for postrescission use of a product, on the presumption under section 1793.22, subdivision (b), and on other matters. MBUSA also argues the trial court should have awarded it an equitable offset for Jiagbogu's use of his Mercedes-Benz car after he requested a replacement or refund from MBUSA.

We hold that the right of a vehicle buyer under the Song-Beverly Consumer Warranty Act to compel a manufacturer to reimburse the purchase price or replace the vehicle is distinct from a rescission; that the manufacturer is not entitled to an offset for use of the vehicle except where that remedy is authorized by the statute; and that the trial court should not instruct on the presumption that the manufacturer has had an adequate opportunity to correct defects in the vehicle where the conditions for claiming the presumption are not shown by the evidence, and the buyer does not assert it. Finding no error, we affirm.

### FACTUAL AND PROCEDURAL SUMMARY

In late July 1998, Jiagbogu purchased a new, top-of-the-line Mercedes-Benz S600 for $144,676 in cash. The car had a four-year/50,000-mile

manufacturer's warranty. During the first week after the sale, the vehicle demonstrated hesitation and lack of power during acceleration. Jiagbogu notified the selling dealership of the problem. A month later, with 1,020 miles on the car's odometer, he brought the car to the selling dealership for repairs, complaining of the acceleration problem and the trunk failing to open properly by remote control. The dealership replaced the catalytic converters.

For the next year, Jiagbogu experienced no acceleration problems but sought repair of trunk and glove compartment malfunctions. In September 1999, with 9,464 miles on the odometer, he took the car to another dealership closer to where he lived, complaining of lack of power during acceleration. The dealership test-drove the car and found no problem with acceleration, but found and fixed other problems. In April 2000, at 19,890 miles, Jiagbogu returned to the same dealership, claiming the same acceleration problem, which the dealership again did not find.

In July and August 2000, Jiagbogu brought the car in three times for hesitation problems and an episode when the car refused to move in the normal drive gear. He also complained that the trunk, doors, and heating system did not work properly. The dealership found various fault codes stored in the car's computer, indicating engine and transmission trouble. It replaced the right engine control module once, the transmission control unit twice, and the gear recognition switch three times, and made other repairs. In November 2000, Jiagbogu brought the car in again for acceleration problems. Its computer showed a fault code, and the dealership made various repairs or replacements. In March 2001, Jiagbogu twice returned to the dealership complaining of lack of power, and the dealership found another fault code and made additional repairs.

In April 2001, at just over 40,000 miles on the odometer, Jiagbogu twice contacted MBUSA and requested replacement or buyback of his car. The company's representative refused, and instead offered further repair attempts. Jiagbogu, frustrated with the earlier record of repair attempts, rejected the offer.

In July 2001, at around 50,000 miles, Jiagbogu sued MBUSA and the selling dealership for breach of express and implied warranties under the Act. He continued to drive the car for roughly 25,000 additional miles between filing of suit and trial, which began in September 2002. During trial, Jiagbogu stipulated to dismissal of the selling dealership as a defendant. In its special verdict, the jury found MBUSA liable to Jiagbogu for $144,676 in damages under the Act. The jury made most of its findings of elements of the Act by votes of nine to three. The jury found by a vote of 10 to two that MBUSA willfully refused to replace Jiagbogu's car or to refund the purchase price, but

it assessed no civil penalty against MBUSA. The trial court awarded Jiagbogu $144,676 plus postjudgment interest, prejudgment interest from May 11, 2001, costs, and attorney's fees.

MBUSA moved for new trial and for judgment notwithstanding the verdict. These motions were denied. MBUSA paid $113,441 in partial satisfaction of the judgment and $62,000 for costs and attorney's fees. It filed this timely appeal.

## DISCUSSION

### I

MBUSA argues the trial court should have instructed the jury that Jiagbogu's continued use of the car after he requested replacement or restitution could have waived his right to rescind. In a related argument, MBUSA claims the court should have instructed that Jiagbogu's use of the car after his buyback request entitled MBUSA to an offset against Jiagbogu's damages under section 1692.

Under the Act, a buyer who discovers a nonconformity in a manufacturer's goods "shall deliver" the nonconforming goods to a repair facility maintained by the manufacturer within the state. (§ 1793.2, subd. (c).) If the nonconforming product is a new motor vehicle and the manufacturer is unable to service or repair the vehicle to conform to applicable express warranties after a reasonable number of attempts, "the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer." (§ 1793.2, subd. (d)(2).) The buyer may elect restitution in lieu of replacement. (§ 1793.2, subd. (d)(2).)

 MBUSA contends that Jiagbogu's request for restitution amounted to a rescission. But section 1793.2 does not refer to rescission or any portion of the Commercial Code that discusses rescission. The Act does not parallel the Commercial Code; it provides different and more extensive consumer protections. (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 301 [45 Cal.Rptr.2d 10] (*Krotin*).) Jiagbogu did not invoke rescission, or any of the common law doctrines or Commercial Code provisions relating to that remedy. It would not matter if he had referred to rescission in his buyback request, as long as he sought a remedy only under the Act, which contains no provision requiring formal rescission to obtain relief. (See *Krotin*, at pp. 300, 302.) MBUSA acknowledges in its brief that Jiagbogu requested refund *or replacement.* That comports with a claim under the Act, not with a traditional cause of action for rescission.

MBUSA cites *Ibrahim v. Ford Motor Co.* (1989) 214 Cal.App.3d 878 [263 Cal.Rptr. 64] (*Ibrahim*), for its argument that continued use after a request for buyback can constitute waiver of the right to rescind. In *Ibrahim*, the plaintiff filed a verified complaint for rescission, restitution and damages, breach of express and implied warranties, fraud, and negligent misrepresentation under the Act, the California Uniform Commercial Code (UCC), and a federal consumer protection statute. (*Ibrahim*, at pp. 883–884.) In considering whether continued use waived the right to revoke acceptance under the UCC, the *Ibrahim* court discussed the nationwide consensus that "reasonable continued use of motorized vehicles does not, as a matter of law, prevent the buyer from asserting rescission (or its U.Com.Code equivalent, revocation of acceptance)." (*Id.* at p. 897.) As part of this consensus, the court explained that a seller is entitled to a setoff for the buyer's use after revocation of acceptance. The court held that "[n]othing in the language of either the [UCC] or [the Act] suggests that abrogation of the common law principles relating to continued use and waiver of a buyer's right to rescind was intended. . . . The legal principles governing continued use . . . are thus still applicable." (*Id.* at p. 898.)

*Ibrahim* did not hold that waiver of the right to rescind applies to actions brought *solely* under the Act. Nor did it rule that any analogous common law principle applies to or limits the Act. Rather, the court held that the Act did not abrogate common law principles applying to causes of action brought under the UCC. By including a cause of action for rescission and invoking the UCC in her complaint, Ms. Ibrahim invoked the common law doctrines of waiver of right to rescind and seller's offset for buyer's use after revocation of acceptance. (*Ibrahim, supra,* 214 Cal.App.3d at pp. 883–884.) Jiagbogu, who filed claims only under the Act, did not.

MBUSA contends that regardless of the language in the Act, section 1793.2 describes a rescission that should be subject to common law and UCC rules for rescission. In practice, a consumer usually will have to request replacement or restitution under the Act, since most manufacturers do not offer these options voluntarily. (*Krotin, supra,* 38 Cal.App.4th at p. 303.) MBUSA argues that a buyback request is "the very definition of rescission." But as we have seen, the Act is designed to give broader protection to consumers than the common law or UCC provide. (*Krotin,* at p. 301.) Had the Legislature intended this more protective statute to be limited by traditional doctrines, or the remedies provided in section 1793.2, subdivision (d) to be treated as a rescission under common law, it surely would have used language to that effect. We may not rewrite the section to conform to that unexpressed, supposed intent. (See *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 993 [73 Cal.Rptr.2d 682, 953 P.2d 858]; *People v. Garcia* (1999) 21 Cal.4th 1, 7 [87 Cal.Rptr.2d 114, 980 P.2d 829].)

The same reasoning applies to MBUSA's related argument that the trial court should have instructed the jury that Jiagbogu's use of the car after his request for a buyback could be considered as a postrescission offset against his damages. This argument also hinges upon MBUSA's claim that the buyback amounts to a rescission. MBUSA points to section 1692 regarding contract rescission and offsets. But as we have seen, the Act does not characterize replacement or buyback under section 1793.2, subdivision (d) as a rescission, nor does it refer to section 1692 in any way. Instead, it protects consumers more extensively than the common law or UCC. MBUSA's lengthy overview of rescission and offsets under the common law of California and other states is thus irrelevant, and its arguments about waiver of rescission and statutory offsets under *Ibrahim* are inapplicable. (See *Ibrahim, supra*, 214 Cal.App.3d at pp. 883–884, 897–898.)

■ Since we reject MBUSA's basic argument that a request for replacement or refund under the Act constitutes rescission, we find no error in the trial court's refusal to instruct on waiver of right to rescind or on statutory offsets for postrescission use.

## II

Along with its arguments based on rescission, MBUSA argues the trial court erred by not exercising its equity powers to grant MBUSA an offset for Jiagbogu's use of the car after his buyback request.

■ The Act does not affect rights and obligations under the Commercial Code, except that where provisions conflict, the Act prevails over the Commercial Code. (§ 1790.3.) Commercial Code section 1103 provides that in general, "principles of law and equity . . . shall supplement [the Commercial Code's] provisions." MBUSA could be entitled to an equitable offset only if the offset does not conflict with provisions of the Act.

The Act does not address "post-rescission" offsets of the sort to which MBUSA claims to be entitled. But it does specifically provide for an offset in one situation: where the buyer uses a nonconforming vehicle before the vehicle is first delivered to the manufacturer for correction of the nonconformity. Section 1793.2, subdivision (d)(2)(C) provides, "When the manufacturer replaces the new motor vehicle . . . , the buyer shall only be liable to pay the manufacturer an amount directly attributable to [the buyer's use before first delivery for correction]. When restitution is made . . . , the amount to be paid by the manufacturer to the buyer may be reduced by the manufacturer by that amount directly attributable to [the buyer's use before first delivery for correction]." The subdivision then sets out a formula for calculating the offset for use before first delivery. This situation does not fit

the case before us, where the buyer used the vehicle after the manufacturer refused to replace it or buy it back.

Nevertheless, MBUSA argues, while the Act does not expressly authorize the sort of offset it seeks, neither does it forbid it, and barring such relief would produce unfair and absurd results. This is because, without the offset, a buyer such as Jiagbogu would receive an unfair windfall. MBUSA points out that section 1793.2, subdivision (d)(2)(C) provides that a buyer shall *only* be liable for an offset for pre-first-delivery use when the manufacturer *replaces* the car, but the word "only" does not appear in the restitution provision of the statute. It reasons that, "Had the Legislature intended to restrict any other set-off in the case of a refund, it would have repeated the word 'only' along with the 42 other words it repeated" from the preceding sentence applying to replacements.

In this argument, MBUSA concedes that the clause applying to replacements does not allow an offset except the pre-first-delivery situation it describes. Thus, cases of replacement are subject to the incongruity MBUSA is complaining about, while cases of restitution are not. Nor would manufacturers be able to protect themselves from this incongruity, since the buyer alone decides whether to elect replacement or restitution. (§ 1793.2, subd. (d)(2).) To read the provisions of subdivision (d)(2)(C) as MBUSA urges would indeed lead to absurd results.

█ Nor is there any need to read them that way. Though the term "only" in subdivision (d)(2)(C) indicates a legislative intent to restrict the specified offset in cases of replacement, the omission of that term in the restitution provision does not demonstrate an intent to allow it in other cases. The two provisions are not exactly parallel, and there is a more straightforward reason for the difference between them. The replacement provision sets a strict limit on what the buyer must pay the manufacturer. The restitution provision gives the manufacturer the option of deducting costs attributable to pre-first-delivery use where the manufacturer is required to make payment to the buyer. In effect, it tells the manufacturer that it may, but need not, deduct the pre-delivery-use offset. Both the replacement and restitution provisions are designed to cap the amount to be paid or deducted, while allowing manufacturers to forgive or ignore the pre-delivery-use offset.

Section 1793.2, subdivision (d)(2)(C), and (d)(2)(A) and (B) to which it refers, comprehensively addresses replacement and restitution; specified predelivery offset; sales and use taxes; license, registration, or other fees; repair, towing, and rental costs; and other incidental damages. None contains any language authorizing an offset in any situation other than the one specified. This omission of other offsets from a set of provisions that thoroughly cover other

relevant costs indicates legislative intent to exclude such offsets. (See *Gikas v. Zolin* (1993) 6 Cal.4th 841, 853 [25 Cal.Rptr.2d 500, 863 P.2d 745].)

■ This exclusion, far from being absurd as MBUSA argues, is in keeping with the Act's overall purpose. The Act is intended to protect consumers and should be construed in keeping with that goal. (*Murillo v. Fleetwood Enterprises, Inc., supra*, 17 Cal.4th at p. 990.) Interpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be avoided. (See *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].) As we have seen, the Act places an affirmative duty on the buyer to deliver a nonconforming product for repair, and an affirmative duty on the manufacturer to *promptly* replace the product or refund the purchase money if repairs are unsuccessful after a reasonable opportunity to repair. (§ 1793.2, subds. (c), (d); *Krotin, supra*, 38 Cal.App.4th at pp. 302–303.) The predelivery offset creates an incentive for the buyer to deliver a car for repairs soon after a nonconformity is discovered. An offset for the buyer's use of a car when a manufacturer, already obliged to replace or refund, refuses to do so, would create a disincentive to prompt replacement or restitution by forcing the buyer to bear all or part of the cost of the manufacturer's delay. Exclusion of such offsets furthers the Act's purpose.

MBUSA argues that Jiagbogu would receive a windfall if he is not required to pay for using the car after his buyback request. But to give MBUSA an offset for that use would reward it for its delay in replacing the car or refunding Jiagbogu's money when it had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly. "No one can take advantage of his own wrong." (§ 3517.) Nor can principles of equity be used to avoid a statutory mandate. (*Ghory v. Al-Lahham* (1989) 209 Cal.App.3d 1487, 1492 [257 Cal.Rptr. 924].)

■ Thus, the trial court properly refused to award MBUSA an equitable offset. Other hypothetical situations raised by MBUSA, such as deliberate vandalism by a buyer or insurance subrogation, may well justify a defense to the buyer's claim. But nothing in this case presents that scenario.

## III

MBUSA argues the trial court also should have instructed the jury on the presumption as to a reasonable number of repair attempts under section 1793.22, subdivision (b).

Under that statute, it is presumed that a manufacturer has had a sufficient opportunity to correct a nonconformity in a new motor vehicle if the

manufacturer has attempted repair of the same problem four or more times within the first 18 months or 18,000 miles after purchase, and the buyer has notified the manufacturer directly of the need for repair of the nonconformity at least once (§ 1793.22, subd. (b)(2)); if the vehicle is out of service for repairs for a cumulative total of more than 30 days during the 18-month/18,000-mile period (§ 1793.22, subd. (b)(3)); or if the vehicle has defects likely to result in death or serious bodily injury (§ 1793.22, subd. (b)(1)). The presumption is rebuttable, affecting the burden of proof. (§ 1793.22, subd. (b)(3).)

Jiagbogu acknowledges that none of these situations apply to his case, and he made no attempt to invoke the benefits of the presumption at trial. MBUSA argues that an instruction on the presumption should have been given even though it did not apply, because the instruction would give the jury an objective standard to decide whether MBUSA had a reasonable number of repair attempts. It contends the Legislature intended the presumption to serve as a general standard for reasonableness. Because the presumption benefits the plaintiff and Jiagbogu did not raise it, an instruction on the presumption in this case would have been irrelevant and likely to mislead the jury. (See *Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1242 [132 Cal.Rptr.2d 765].)

■ MBUSA argues that it needed the presumption instruction to show good faith as a defense against a finding of willfulness and possible civil penalty under section 1794, subdivision (c). At trial, MBUSA presented evidence that its representative rejected Jiagbogu's buyback request due to a good faith understanding that a vehicle is not subject to the Act unless it comes within one of the three categories that trigger the presumption. MBUSA thus had an opportunity to show good faith. An instruction on the inapplicable presumption was neither required nor justified.

Not only did the trial court rule correctly in refusing to give it, giving it would have constituted serious error.

## IV

MBUSA argues the cumulative effect of other errors requires reversal. We disagree. Various special instructions regarding waiver of the right to rescind, offsets, and UCC or common law measures of damages were properly refused for reasons we have already discussed. We find no abuse of discretion in these or other instructional rulings by the trial court. (See *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 906 [88 Cal.Rptr.2d 594].) After an Evidence Code section 402 hearing at which the parties' experts differed over whether certain car malfunctions after the warranty

period could be related to malfunctions while under warranty, the trial court properly denied MBUSA's motion in limine to exclude evidence of those postwarranty malfunctions. The trial court also correctly denied MBUSA's motions for new trial and for judgment notwithstanding the verdict, which raised the issues we have discussed in this appeal. (See *Garcia v. Rehrig Internat., Inc.* (2002) 99 Cal.App.4th 869, 874 [121 Cal.Rptr.2d 723]; *Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730 [60 Cal.Rptr.2d 698].) Since there is no error in these individual rulings, there is, of course, no cumulative error.

## DISPOSITION

The judgment is affirmed. Respondent is to have his costs on appeal.

Hastings, J., and Curry, J., concurred.