Filed 10/30/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LISA NIEDERMEIER, | B293960 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC638010) |
| v. | |
| FCA US LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel S. Murphy, Judge. Affirmed as modified.

Gibson, Dunn & Crutcher, Thomas H. Dupree, Jr., Matt Gregory, Shaun Mathur; Clark Hill and David L. Brandon for Defendant and Appellant.

Knight Law Group, Steve Mikhov, Amy Morse; Hackler Daghighian Martino & Novak, Sepehr Daghighian, Erik K. Schmitt; Greines, Martin, Stein & Richland, Cynthia E. Tobisman and Joseph V. Bui for Plaintiff and Respondent.

_____

Defendant FCA US LLC, an automobile manufacturer,[1] appeals from a judgment in favor of plaintiff Lisa Niedermeier. Plaintiff brought claims under the Song-Beverly Consumer Warranty Act (Civ. Code,[2] § 1790 et seq.) (the Act), commonly known as the "lemon law." (See *Warren v. Kia Motors America, Inc.* (2018) 30 Cal.App.5th 24, 28.) The jury awarded plaintiff the full purchase price of her defective vehicle, offset by mileage accrued before she first delivered it for repair, plus incidental and consequential damages and a civil penalty.

Following the jury's verdict, the trial court denied defendant's motion to reduce plaintiff's damages by the $19,000 credit plaintiff received towards the purchase price of a new vehicle when she traded in her defective vehicle to a GMC dealer. The trial court ruled that reducing the damages here would reward defendant for its delay in providing prompt restitution as required under the Act. On appeal, defendant challenges that ruling.

As a matter of first impression, we hold that the Act's restitution remedy, set at "an amount equal to the actual price paid or payable" for the vehicle (§ 1793.2, subd. (d)(2)(B)), does not include amounts a plaintiff has already recovered by trading in the vehicle at issue. The Legislature chose to call the Act's refund remedy "restitution," indicating an intent to restore a plaintiff to the financial position in which she would have been had she not purchased the vehicle. Granting plaintiff a full

---

[1] Defendant was formerly known as Chrysler Group LLC. It is a wholly owned subsidiary of FCA North America Holdings LLC, which in turn is wholly owned by Fiat Chrysler Automobiles N.V.

[2] Undesignated statutory citations are to the Civil Code.

refund from defendant in addition to the proceeds of the trade-in would put her in a *better* position than had she never purchased the vehicle, a result inconsistent with "restitution."

Allowing plaintiff a full refund also would undercut other parts of the Act. The Act contains extensive provisions requiring manufacturers to label vehicles reacquired under the Act as "Lemon Law Buybacks," and to notify potential purchasers of the reacquired vehicles of that designation as well as the vehicles' history of deficiencies. These provisions apply only when the manufacturer reacquires or assists another in reacquiring the vehicle. Yet if a buyer could trade in a defective vehicle in exchange for a reduction in the price of a new car while still receiving a full refund from the manufacturer, few if any buyers would sacrifice the extra money by returning the vehicle. This would render the labeling and notification provisions largely meaningless, a consequence the Legislature could not have intended.

Accordingly, we reduce the damage award to reflect the value of plaintiff's trade-in, and also reduce the civil penalty, which is capped at twice the amount of actual damages. (§ 1794, subd. (c).) As modified, we affirm the judgment.

## FACTUAL BACKGROUND

Plaintiff purchased a new Jeep Wrangler in January 2011 for approximately $40,000. Over the several years she owned the vehicle, plaintiff experienced numerous problems with it and brought it in for repair multiple times.

Around April 2015, plaintiff requested that defendant, the Jeep's manufacturer, buy back the vehicle. Defendant did not do so. Plaintiff then traded in the vehicle to a GMC dealership, in exchange for which she received $19,000 off the purchase price of

3

a GMC Yukon. Plaintiff's counsel represented to the trial court that the sticker price of the Yukon was $80,000.

## PROCEDURAL BACKGROUND

In October 2016, plaintiff filed a lawsuit against defendant alleging, inter alia, causes of action for breach of express and implied warranty under the Act.[3]

In advance of trial, plaintiff filed a motion in limine to exclude "evidence or argument relating to a monetary offset based on plaintiff's sale of the subject vehicle." (Capitalization omitted.) The trial court granted the motion, and stated it would address the issue of an offset after trial if plaintiff prevailed.

At trial, plaintiff testified regarding her failed attempts to sell the car before ultimately trading it in to the GMC dealer. In light of this testimony, the trial court allowed defense counsel to elicit testimony regarding the value of the trade-in. Defense counsel asked plaintiff: "You sold it to a GMC dealership for $19,000; right?" Plaintiff replied, "Right."

Following the close of evidence, defendant requested that the trial court add an offset for the trade-in of the Jeep to the special verdict form. The trial court declined the request, preferring to decide the offset issue itself after trial. Plaintiff agreed with this approach.

The jury found in favor of plaintiff on her cause of action for breach of express warranty. The jury awarded damages of $39,584.43, which included $39,799 for the purchase price of the

---

[3] The complaint also alleged causes of action for fraudulent inducement/concealment against defendant and negligent repair against Glendale Dodge. Those causes of action are not at issue in this appeal.

4

Jeep plus certain specified charges, taxes, and fees; $5,000 in incidental and consequential damages; and a deduction of $5,214.57 reflecting the use plaintiff obtained from the vehicle before first bringing it in for repairs. The jury also awarded a civil penalty of $59,376.65, one-and-a-half times the damages award, for a total award of $98,961.08.[4]

Defendant then filed a motion requesting the trial court reduce the damages by $19,000 to reflect the trade-in of the Jeep. Because the jury had imposed a civil penalty one-and-a-half times the damages, defendant requested the civil penalty be set at one-and-a-half times the reduced damages, for a total award of $51,461.07.

The trial court denied the motion. Relying primarily on *Martinez v. Kia Motors America, Inc.* (2011) 193 Cal.App.4th 187 (*Martinez*) and *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235 (*Jiagbogu*), the trial court concluded that reducing the damages and penalty would be "inconsistent with the proconsumer policy supporting the Act," and would "reward defendant for its delay in replacing the car or refunding plaintiff's money when defendant had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly." The trial court stated that " '[i]nterpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be avoided.' " (Quoting *Jiagbogu*, at p. 1244.)

Defendant filed motions for a new trial and to set aside and vacate the judgment, again arguing that the damages and civil

---

[4] The jury found in favor of plaintiff on her implied warranty claim as well, awarding damages of $20,799. Those damages were not added to the final award, presumably because they were duplicative.

5

penalty should be reduced to reflect the $19,000 trade-in. The trial court denied the motions.

Defendant timely appealed.

## STANDARD OF REVIEW

This appeal presents "a question of statutory . . . interpretation subject to our independent review." (*Dignity Health v. Local Initiative Healthcare Authority of Los Angeles County* (2020) 44 Cal.App.5th 144, 154.) "To determine the Legislature's intent in interpreting [the Act], '[w]e first examine the statutory language, giving it a plain and commonsense meaning.' [Citation.] We do not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context. [Citation.] If the language is unambiguous, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' [Citation.] 'If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Kirzhner v. Mercedes-Benz USA, LLC* (2020) 9 Cal.5th 966, 972 (*Kirzhner*).) "[W]e may reject a literal construction that is contrary to the legislative intent apparent in the statute or that would lead to absurd results." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 27 (*Simpson Strong-Tie*).)

"We keep in mind that the Act is ' "manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action." ' " (*Kirzhner, supra*, 9 Cal.5th at p. 972.)

## DISCUSSION

### A.   The Song-Beverly Consumer Warranty Act

The Act "provides certain protections and remedies for consumers who purchase consumer goods such as motor vehicles covered by express warranties." (*Martinez, supra*, 193 Cal.App.4th at p. 193.)  The Act requires that manufacturers of consumer goods covered by express warranties provide "service and repair facilities" in the state "to carry out the terms of those warranties." (§ 1793.2, subd. (a)(1)(A).)  "In order to trigger the manufacturer's service and repair obligations, the buyer . . . 'shall deliver nonconforming goods to the manufacturer's service and repair facility within this state. . . .'" (*Martinez*, at p. 193, quoting § 1793.2, subd. (c).)[5]  Motor vehicles are nonconforming for purposes of the Act if the nonconformity "substantially impairs the use, value, or safety of the new motor vehicle to the buyer or lessee." (§ 1793.22, subd. (e)(1).)

If a manufacturer "is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts," the manufacturer must either "promptly replace the new motor vehicle" or "promptly make restitution to the buyer . . . ." (§ 1793.2, subd. (d)(2).)  "In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and

---

[5]  A buyer need not deliver the nonconforming goods to the manufacturer's service and repair facility if, "due to reasons of size and weight, or method of attachment, or method of installation, or nature of the nonconformity, delivery cannot reasonably be accomplished." (§ 1793.2, subd. (c).)

7

manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales or use tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer." (§ 1793.2, subd. (d)(2)(B).)

The Act permits a manufacturer to reduce the restitution "by that amount directly attributable to use by the buyer prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity." (§ 1793.2, subd. (d)(2)(C).) The Act provides a specific formula to calculate this reduction based on the vehicle's mileage prior to the buyer first delivering it for repair.[6] (§ 1793.2, subd. (d)(2)(C).)

A buyer "who is damaged by a failure to comply with any obligation under [the Act] . . . may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a).) "The measure of the buyer's damages in an action under this section shall include the rights of replacement

---

[6] "The amount directly attributable to use by the buyer shall be determined by multiplying the actual price of the new motor vehicle paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, by a fraction having as its denominator 120,000 and having as its numerator the number of miles traveled by the new motor vehicle prior to the time the buyer first delivered the vehicle to the manufacturer or distributor, or its authorized service and repair facility for correction of the problem that gave rise to the nonconformity." (§ 1793.2, subd. (d)(2)(C).)

or reimbursement as set forth in subdivision (d) of Section 1793.2, and the following:  [¶]  (1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply.  [¶]  (2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." (§ 1794, subd. (b).)

Upon a showing that a manufacturer's noncompliance with the Act was "willful," the Act allows "a civil penalty which shall not exceed two times the amount of actual damages."  (§ 1794, subd. (c).)[7]  A prevailing buyer may also recover reasonable attorney's fees and costs.  (*Id.*, subds. (d), (e)(1).)

The Act also contains provisions preventing manufacturers and others from reselling "used and irrepairable motor vehicles" reacquired under the Act "without notice to the subsequent purchaser."  (§ 1793.23, subd. (a)(2).)  When a manufacturer "reacquires" a vehicle, or "assists a dealer or lienholder to reacquire" a vehicle, and knows or should know that the manufacturer must replace or "accept[ the vehicle] for restitution" under section 1793.2, subdivision (d)(2), the manufacturer may not sell, lease, or transfer the vehicle to another party without first retitling the vehicle in the name of the manufacturer, requesting that the Department of Motor Vehicles "inscribe the ownership certificate with the notation 'Lemon Law Buyback,' " and "affix[ing] a decal to the vehicle"

---

[7] Subdivision (e) of section 1794 provides circumstances in which a buyer may obtain a civil penalty without proving willful noncompliance.  That subdivision is not at issue in this case.

indicating that it has been designated a "Lemon Law Buyback." (Civ. Code, § 1793.23, subd. (c); Veh. Code, § 11713.12, subd. (a).)

In addition, a "manufacturer who reacquires or assists a dealer or lienholder to reacquire a motor vehicle in response to a request by the buyer or lessee that the vehicle be either replaced or accepted for restitution because the vehicle did not conform to express warranties" may not sell, lease, or transfer the vehicle without providing written notice to the transferee of, inter alia, the "Lemon Law Buyback" notation on the vehicle's title, the nonconformities reported by the original buyer or lessee, and any repairs attempted to correct the nonconformities. (§§ 1793.23, subd. (d), 1793.24, subd. (a)(2)–(4).) These notice requirements also apply to "[a]ny person, including any dealer" who acquires the vehicle for resale knowing the manufacturer had reacquired it for replacement or restitution under the Act. (§ 1793.23, subd. (e).)

Similarly, the Act prohibits the sale, lease or transfer of a vehicle "transferred by a buyer or lessee to a manufacturer pursuant to [section 1793.2, subdivision (d)] or a similar statute of any other state" absent disclosure of the vehicle's nonconformities, correction of those nonconformities, and a one-year manufacturer warranty that the vehicle is free of the nonconformities. (§ 1793.22, subd. (f)(1).)

We refer to sections 1793.22, subdivision (f)(1) and 1793.23, subdivisions (c) through (e) as the Act's "labeling and notification provisions."

## B.    Relevant case law

There are three cases interpreting the Act that are of particular relevance to the issues in this appeal. In its decision below, the trial court relied on two of them, *Martinez* and

10

*Jiagbogu*, as does plaintiff on appeal.  Defendant relies on the
third case, *Mitchell v. Blue Bird Body Co.* (2000) 80 Cal.App.4th
32 (*Mitchell*).  We discuss the cases in chronological order.

### 1. *Mitchell*

*Mitchell* held that the restitution remedy under
section 1793.2, subdivision (d)(2) includes the finance charges
paid by a buyer who purchases a new motor vehicle on credit,
even though those charges are not listed as an item of recovery in
that subdivision.  (*Mitchell*, *supra*, 80 Cal.App.4th at pp. 34, 36.)

The court concluded that "the mere absence of a reference"
to finance charges in section 1793.2, subdivision (d)(2)(B) "is not,
by itself, controlling." (*Mitchell*, *supra*, 80 Cal.App.4th at p. 36.)
The court quoted section 1790.4 of the Act, stating " '[t]he
remedies provided by [the Act] are cumulative and shall not be
construed as restricting any remedy that is otherwise
available . . . .' "  The court then cited cases for the proposition
that "the [A]ct is remedial legislation intended to protect
consumers and should be interpreted to implement its beneficial
provisions." (*Ibid.*)  "In addition," the court stated, "section
1793.2(d)(2) expressly characterizes the refund remedy as
'restitution.' [Citation.]  This remedy is intended to restore 'the
*status quo ante* as far as is practicable . . . .' " (*Mitchell*, at p. 36,
quoting *Alder v. Drudis* (1947) 30 Cal.2d 372, 384 (*Alder*).)

The court rejected the argument that, because
section 1793.2, subdivision (d)(2)(B) "does not expressly allow
recovery of paid finance charges," it therefore impliedly prohibits
recovery of those charges. (*Mitchell*, *supra*, 80 Cal.App.4th at
p. 37.)  "[F]inding an implied prohibition on recovery of finance
charges would be contrary to both the . . . Act's remedial purpose
and section 1793.2(d)(2)(B)'s description of the refund remedy as

11

restitution.  A more reasonable construction is that the Legislature intended to allow a buyer to recover the entire amount actually expended for a new motor vehicle, including paid finance charges, less any of the expenses expressly excluded by the statute." (*Mitchell*, at p. 37.)

### 2.    *Jiagbogu*

In *Jiagbogu*, our colleagues in Division Four rejected a defendant manufacturer's arguments that common law and statutory principles of rescission and equitable offset limit the remedies under the Act.  The manufacturer argued that a request for restitution under section 1793.2, subdivision (d)(2) constituted a rescission, and therefore a buyer who continued to use the vehicle after requesting restitution could waive his right to that remedy.  (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1240.)

Relatedly, the manufacturer argued that it could receive a statutory offset for the continued use of the vehicle under section 1692, a provision of the Civil Code, separate from the Act, that allows for offsets in rescission actions.  (*Jiagbogu*, *supra*, 118 Cal.App.4th at pp. 1240, 1242; § 1692 [providing, in relevant part, "If in an action or proceeding a party seeks relief based upon rescission, the court may require the party to whom such relief is granted to make any compensation to the other which justice may require and may otherwise in its judgment adjust the equities between the parties"].)

The court disagreed, noting that "section 1793.2 does not refer to rescission or any portion of the Commercial Code that discusses rescission," nor does the Act "requir[e] formal rescission to obtain relief." (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1240.) Moreover, "the Act is designed to give broader protection to consumers than the common law or [Uniform Commercial Code]

12

provide.  [Citation.]  Had the Legislature intended this more protective statute to be limited by traditional doctrines, or the remedies provided in section 1793.2, subdivision (d) to be treated as a rescission under common law, it surely would have used language to that effect.  We may not rewrite the section to conform to that unexpressed, supposed intent." (*Jiagbogu*, at p. 1241.)  Thus, principles of "waiver of right to rescind or . . . statutory offsets for postrescission use" under section 1692 were not applicable to "request[s] for replacement or refund under the Act." (*Jiagbogu*, at p. 1242.)

The court also rejected the manufacturer's argument that it was entitled to an offset for continued use of the vehicle as a matter of equity.  (*Jiagbogu*, *supra*, 118 Cal.App.4th at pp. 1242, 1244.)  The court recognized that, under section 1790.3, the Act did not supplant the provisions of the Commercial Code unless the provisions conflicted with those of the Act.  (*Jiagbogu*, at p. 1242.)  Moreover, "Commercial Code section 1103 provides that in general, 'principles of law and equity . . . shall supplement [the Commercial Code's] provisions.' " (*Jiagbogu*, at p. 1242.)  Thus, the manufacturer "could be entitled to an equitable offset," but "only if the offset does not conflict with provisions of the Act." (*Ibid.*)

Having laid out these principles, the court concluded that an offset for continued use of a vehicle after requesting replacement or restitution would conflict with the provisions of the Act.  (See *Jiagbogu*, *supra*, 118 Cal.App.4th at pp. 1243–1244.)  The court noted that section 1793.2, subdivision (d)(2) expressly provides for an offset for use of the vehicle *prior* to the buyer first delivering the vehicle for repair, and otherwise "comprehensively addresses" the relief to which a buyer is

13

entitled, including replacement and restitution, specified taxes, fees, and costs, and other incidental damages. (*Jiagbogu*, at p. 1243.) "This omission of other offsets from a set of provisions that thoroughly cover other relevant costs indicates legislative intent to exclude such offsets." (*Id.* at pp. 1243–1244.)

The court further concluded that excluding an offset for continued use after a request for replacement or restitution "is in keeping with the Act's overall purpose" to "protect consumers." (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1244.) "The predelivery offset creates an incentive for the buyer to deliver a car for repairs soon after a nonconformity is discovered. An offset for the buyer's use of a car when a manufacturer, already obliged to replace or refund, refuses to do so, would create a disincentive to prompt replacement or restitution by forcing the buyer to bear all or part of the cost of the manufacturer's delay." (*Ibid.*) "Interpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be avoided." (*Ibid.*)

The court was unmoved that a buyer might "receive a windfall if he is not required to pay for using the car after his buyback request." (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1244.) "[T]o give [the manufacturer] an offset for that use would reward it for its delay in replacing the car or refunding [the plaintiff's] money when it had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly. 'No one can take advantage of his own wrong.' (§ 3517.) Nor can principles of equity be used to avoid a statutory mandate." (*Jiagbogu*, at p. 1244.)

### 3.   *Martinez*

*Martinez* held that a "plaintiff does not need to possess or own the vehicle to avail himself or herself of the Act's remedies."

14

(*Martinez, supra*, 193 Cal.App.4th at p. 192.)  Therefore the trial court erred in granting summary judgment against a plaintiff whose lien holder had repossessed and sold her vehicle.  (*Id.* at p. 190.)

The court in *Martinez* began with the "plain language" of the Act, which "says nothing about the buyer having to retain the vehicle after the manufacturer fails to comply with its obligations under its warranty and the Act.  If the Legislature intended to impose such a requirement, it could have easily included language to that effect.  It did not." (*Martinez, supra*, 193 Cal.App.4th at p. 194.)

The court distinguished cases from other states relied on by the defendant, noting that the " 'lemon law[s]' " of those jurisdictions had specific provisions requiring the buyer to return the vehicle in order to receive restitution.  (*Martinez, supra*, 193 Cal.App.4th at p. 196.)  "The absence of a similar express statutory requirement in California's 'lemon law' is significant. In line with the legislative intent and purpose, there is simply no requirement that California consumers be able to tender the allegedly defective car for purposes of availing themselves of the remedies provided by the Act." (*Id.* at p. 197.)

In a footnote, the court rejected the argument "that return of the vehicle is 'compelled' " by the Act's labeling and notification provisions under sections 1793.22, subdivision (f) and 1793.23, subdivisions (d) and (e). (*Martinez, supra*, 193 Cal.App.4th at p. 194, fn. 4.)  "Because defendant did not 'reacquire' the present vehicle, the [notification] statutes are simply inapplicable and do not assist our interpretation of the relevant provisions." (*Ibid.*)

The court further was concerned that "[t]o read into the statute an unexpressed requirement that the consumer possess

15

or own the vehicle as a condition to obtaining relief would have a chilling effect on the availability of the Act's remedies." (*Martinez*, *supra*, 193 Cal.App.4th at p. 195.)  The court surmised that many consumers, faced with continuing payments for a "derelict vehicle" while pursuing the Act's remedies in court, "would reasonably do just what plaintiff did here—discontinue the payments and allow the vehicle to be repossessed." (*Ibid.*)  To preclude those consumers from the Act's remedies "[n]ot only is . . . inconsistent with the proconsumer policy supporting the Act, but . . . would encourage a manufacturer who has failed to comply with the Act to delay or refuse to provide a replacement vehicle or reimbursement; any delay increases the likelihood that the buyer will be forced to relinquish the car to a lienholder." (*Ibid.*)  "Defendant's construction of the statute is calculated to allow the manufacturer to sidestep the protections afforded the consumer by the Act and encourage 'the manufacturer's unforthright approach and stonewalling of fundamental warranty problems.' " (*Ibid.*)

Citing *Jiagbogu*, the court also concluded that the Act was not subject to common law and Commercial Code requirements that "a party seeking to rescind a contract must generally return any consideration received." (*Martinez*, *supra*, 193 Cal.App.4th at pp. 197–198.)  The court was not persuaded by the defendant's reliance on the discussion of restitution in *Mitchell* and *Alder*:  *Mitchell*, concerned with whether restitution under section 1793.2, subdivision (d)(2) included finance charges, "has no application to the issues in this case and *Alder* predates the Act by 23 years and applies common law rules of equity." (*Martinez*, at p. 199.)

16

## C. Analysis

### 1. Restitution under the Act does not include amounts recovered from the trade-in of the defective vehicle

Defendant does not challenge the holding of *Martinez* or the principle that a buyer need not return the vehicle to the manufacturer to receive restitution under the Act. Instead, defendant contends that if a buyer recovers some of the purchase price of the vehicle through a trade-in to a third party dealer, rather than returning it to the manufacturer, the Act requires that the buyer's restitution be reduced accordingly.

Defendant raises three arguments in favor of its position. First, defendant argues that the concept of restitution contemplates that the buyer is restored to the same economic position she would have been in had she never purchased the vehicle. By obtaining a full refund in addition to the proceeds from the trade-in, plaintiff received "a windfall that cannot possibly be characterized as 'restitution.' "

Second, defendant argues that the Commercial Code sections expressly incorporated into section 1794 of the Act "recognize that a buyer's warranty recovery is reduced by the amount she obtains by reselling the nonconforming goods."

Third, defendant contends that the trial court's decision, if upheld, would effectively nullify the Act's requirement that manufacturers notify subsequent purchasers of reacquired vehicles' defects, because "no rational consumer would return her defective car" and forego the opportunity to recover additional money by selling it. This would undermine "the Legislature's protections for downstream consumers in the used-car market."

17

We agree with the first and third arguments and therefore do not address defendant's second argument under the Commercial Code.

Like the court in *Mitchell*, we think it significant that the Legislature chose the term "restitution" to define the Act's refund remedy in section 1793.2, subdivision (d)(2). The *Mitchell* court interpreted that choice to mean that the Legislature intended that remedy "to restore 'the *status quo ante* as far as is practicable . . . .' "—in other words, to place the buyer in the position he or she would have been in had he or she not purchased the defective vehicle. (*Mitchell*, *supra*, 80 Cal.App.4th at p. 36.) Relying on this principle, the *Mitchell* court interpreted section 1793.2, subdivision (d)(2) to permit the recovery of costs beyond those expressly listed there, in that case the interest payments on the vehicle loan, in order to make the plaintiff whole. (*Mitchell*, at p. 37).

Just as the *Mitchell* court concluded that "restitution" under the Act cannot leave a plaintiff in a worse position than when he or she purchased the vehicle, it similarly would be inimical to the concept of restitution to leave a plaintiff in a better position, rather than merely restoring her to the *status quo ante*. Yet that is the outcome of the trial court's ruling here— plaintiff obtains not only a full refund from defendant, but also the $19,000 benefit she had already obtained by trading in the Jeep. It is true that section 1793.2, subdivision (d)(2)(B) sets the amount of restitution at "the actual price paid or payable." To read this literally, however, to permit plaintiff to recover far more from defendant than her actual economic loss disregards the Legislature's choice of the term "restitution," and leads to an unjustified windfall.

18

Further, "[w]e do not consider statutory language in isolation," and must "examine the entire statute to construe the words in context." (*Kirzhner*, *supra*, 9 Cal.5th at p. 972.) Applying those principles of statutory construction, we agree with defendant that to interpret section 1793.2, subdivision (d)(2)(B) to permit plaintiff to trade in her vehicle and still receive a full refund from defendant undercuts the Act's labeling and notification provisions, which require manufacturers to label vehicles reacquired under the Act as "lemons" and to notify subsequent buyers of that fact. (§§ 1793.22, subd. (f); 1793.23, subds. (c)–(e).)

Importantly, the labeling and notification provisions are triggered only when a manufacturer reacquires a vehicle or assists a dealer or lienholder in reacquiring a vehicle. (See § 1793.22, subd. (f) [applying to persons transferring vehicles previously transferred to a manufacturer under § 1793.2, subd. (d)(2)]; § 1793.23, subds. (c)–(d) [applying to manufacturers who reacquire or assist a dealer or lienholder in reacquiring a vehicle]; *id.*, subd. (e) [applying to persons who acquire vehicles for resale knowing the vehicles were reacquired by the manufacturer].) Accordingly, they are not triggered when a buyer resells or trades in the vehicle, as plaintiff did in this case.

This limitation makes sense only if, in the usual case, the vehicle is returned to the manufacturer rather than resold or traded in. Otherwise, the labeling and notification provisions would have marginal utility, and the used-car market would be replete with unlabeled lemons resold or traded in by their dissatisfied owners. Yet this would be the outcome if buyers could resell or trade in their vehicles and still receive a full refund of the purchase price under the Act. Under that

19

interpretation, we cannot conceive why a buyer would ever return a vehicle to the manufacturer rather than obtain the extra proceeds from a resale or trade. Return of the vehicle to the manufacturer would be the rare exception rather than the rule.

In short, a ruling in plaintiff's favor here would render the labeling and notification provisions largely meaningless, a result contrary to the rules of statutory construction. (*Aleman v. Airtouch Cellular* (2012) 209 Cal.App.4th 556, 568 ["We seek to avoid any interpretation that renders part of the statute ' "meaningless or inoperative" ' "].) Worse, it would incentivize buyers to reintroduce defective vehicles into the market without the warnings a manufacturer otherwise would have to provide. This cannot have been the Legislature's intent.

We thus conclude that the requirement in section 1793.2, subdivision (d)(2)(B) that a manufacturer "make restitution in an amount equal to the actual price paid or payable by the buyer" does not include amounts already recovered by the buyer through trade-in. To conclude otherwise would be "contrary to the legislative intent apparent in the statute" and "would lead to absurd results" (*Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 27), including a near nullification of the labelling and notification provisions.

*Jiagbogu and Martinez*, the cases relied upon by the trial court, presented decidedly different circumstances. In those cases, rulings in the manufacturers' favor would have deprived the plaintiffs of the full purchase price of their vehicles—in *Jiagbogu*, by reducing the refund to reflect use of the vehicle after the buyer requested restitution (*Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1240), and in *Martinez* by barring recovery at all after the vehicle was repossessed (*Martinez*, *supra*, 193

20

Cal.App.4th at p. 190). That concern does not exist here, where plaintiff can recover the full purchase price through a combination of the trade-in and restitution from defendant. Plaintiff is not "bear[ing] all or part of the cost of the manufacturer's delay." (*Jiagbogu*, at p. 1244.)

Jiagbogu and Martinez are further distinguishable in that their holdings do not incentivize plaintiffs to thwart other provisions of the Act. It is true the repossessed vehicle in *Martinez*, like the traded-in vehicle here, presumably would evade the Act's labeling and notification provisions. The holding in *Martinez* did not financially reward the plaintiff for this result; it merely relieved her of the burden of shouldering payments for a derelict vehicle in order to seek remedies under the Act.

Here, in contrast, plaintiff received a $19,000 discount on the price of a new vehicle that, according to plaintiff's counsel, cost twice the purchase price of the Jeep she traded in. Allowing plaintiff also to receive a full refund from defendant would not relieve a financial burden, as was the case in *Martinez*. Instead, it would give plaintiff a windfall and incentivize future plaintiffs to seek that same windfall. Neither *Jiagbogu* nor *Martinez* confronted that possibility. *Martinez*, moreover, did not address the question before us, that is, what impact not returning the vehicle would have on the amount of a plaintiff's restitution under the Act.

Plaintiff raises a number of arguments challenging defendant's interpretation of the Act. Plaintiff argues, in line with *Jiagbogu*, that section 1793.2, subdivision (d)(2)'s single express offset—for use of the vehicle before it is first brought in for repairs—indicates legislative intent not to permit other offsets. (*Jiagbogu*, *supra*, 118 Cal.App.4th at pp. 1243–1244.)

21

We have no quarrel with this principle to the extent it is consistent with the notion that a buyer is entitled to recover the full purchase price of the vehicle, with no deductions for wear-and-tear apart from that which is expressly permitted. It does not follow that the Legislature intended a buyer to recover *more* than the full purchase price of the vehicle, which would be inconsistent with the Legislature's chosen term "restitution," and would undercut the Act's labeling and notification provisions.

Plaintiff contends that buyers trading in their vehicles is "predictable, and "[t]here is no reason to assume that the Legislature did not fully anticipate the very situation presented here." Thus, plaintiff argues, the "omission of any offset for trade-in credits must be read as a *deliberate* decision, not an oversight or an invitation for courts to imply provisions."

Our interpretation does not assume an oversight on the part of the Legislature. Our interpretation harmonizes express provisions of the Act, including the term "restitution" and the extensive labeling and notification provisions for reacquired vehicles, which indicate a legislative expectation that, in the usual case, buyers will return their defective vehicles to the manufacturer. This is not consistent with the regime advocated by plaintiff that would permit buyers to recover the full purchase price in addition to amounts obtained from trade-in or resale, thus incentivizing them not to return defective vehicles to the manufacturer.

Plaintiff claims that the legislative history of amendments to the Act demonstrates a concern that manufacturers exploited ambiguities in the Act's original language to claim offsets that "unfairly reduc[ed] a consumer's restitution," such as offsets for sales tax, license and registration fees, and rental car use.

Plaintiff contends the Legislature thus enacted the "comprehensive damages provision" in order to remove those ambiguities and provide a straightforward formula to calculate damages in the consumer's favor. Accepting arguendo plaintiff's characterization of the legislative history, it merely reinforces the principle that the Act is intended to make buyers whole. Our interpretation of the Act, which allows plaintiff to recover the full purchase price of the vehicle through a combination of the trade-in and damages from defendant, does not conflict with this principle.

Plaintiff disputes that *Mitchell* supports our interpretation of the term "restitution," because "*Mitchell* held that the Act had to be expansively construed to provide remedies *for consumers*," not manufacturers. The significance of *Mitchell* is its emphasis that the Legislature chose the term "restitution" for a reason, indicating an intent that buyers of defective vehicles be restored to the *status quo ante*. (*Mitchell*, *supra*, 80 Cal.App.4th at p. 36.) Nothing in our holding conflicts with this principle—plaintiff receives the full purchase price of her vehicle, as intended by the Legislature. It is granting her more than the purchase price that conflicts with the Legislature's choice of the term "restitution."

To the extent *Martinez* took issue with *Mitchell*'s applying a common-law gloss to the Act's use of the term "restitution," *Martinez* did so in the context of preserving the plaintiff's right to recover under the Act despite not returning the vehicle. (*Martinez*, *supra*, 193 Cal.App.4th at p. 199.) As we have noted above, *Martinez* did not confront the situation presented here, in which plaintiff would be financially rewarded for not returning the vehicle. *Martinez* therefore is not instructive on whether the term "restitution" may be interpreted to allow that result.

Plaintiff's argument under *Mitchell* also relies on the false premise that to disallow her a double recovery would be anti-consumer. Our interpretation is neutral. It fully compensates plaintiff while implementing the protective measures in the labeling and notification provisions in the Act, which benefit the consuming public.

Plaintiff contends that interpreting the Act as we have effectively rewards defendant for failing to provide the prompt restitution required by the Act. Plaintiff characterizes a reduction in damages along with a lowered amount of allowable civil penalty as a "windfall." Plaintiff argues this will incentivize similar dilatory conduct from manufacturers hoping buyers will trade in their vehicles in frustration, rendering "superfluous" the Act's requirement that manufacturers provide prompt restitution.

It is true that prior cases have rejected interpretations of the Act that allow manufacturers to benefit from delays in compliance. (See, e.g.*, Jiagbogu*, *supra*, 118 Cal.App.4th at p. 1244 [rejecting restitution offset that "would reward [the manufacturer] for its delay in replacing the car or refunding [the buyer's] money when it had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly"].) To the extent that concern exists here, however, it is outweighed by the consequences of interpreting the Act in plaintiff's favor, namely actively incentivizing buyers to introduce lemon vehicles into the used-car market without the labeling and notifications required of manufacturers who reacquire vehicles. Neither *Jiagbogu* nor any other case we have found confronts a circumstance in which a ruling against the manufacturer would have such negative consequences. We further note that the Act's

24

provisions of a civil penalty and attorney fees to a successful plaintiff serve to encourage prompt compliance, even if the manufacturer may reduce a plaintiff's restitution by the trade-in value of the vehicle.

Plaintiff disputes the concern that buyers trading in their vehicles rather than returning them to the manufacturer will lead to "un-branded lemons entering the stream of commerce." Plaintiff argues that a dealer who accepts a trade-in is capable of determining whether the vehicle is defective. Plaintiff further contends that the Act contains sufficient protections for buyers of used vehicles, including implied warranties of fitness and merchantability, as well as any protections available under an express warranty.

The fact that a dealer may on its own discover the deficiencies in a traded-in vehicle, or that a buyer upon discovering those deficiencies may seek various warranty remedies, is hardly a substitute for informing a purchaser up front that the vehicle is a reacquired lemon and providing the vehicle's history of nonconformities and repairs. Indeed, in enacting the robust labeling and notification provisions in sections 1793.22 and 1793.23, the Legislature clearly indicated an intent to provide greater protections for potential buyers of known lemons than would be available to buyers of other used cars. As we have already discussed, accepting plaintiff's interpretation of the Act would severely undercut if not nullify those protections.

Plaintiff argues that statutory damages may exceed actual damages, and thus it is appropriate for her to recover full restitution from defendant despite the $19,000 trade-in. Notably, plaintiff's cited authorities, none of which is a California case, do

not apply this principle in the context of restitution.  (See *Parchman v. SLM Corp.* (6th Cir. 2018) 896 F.3d 728; *Universal Underwriters Insurance Company v. Lou Fusz Automotive Network, Inc.* (8th Cir. 2005) 401 F.3d 876.)  Regardless, to apply that principle here would incentivize buyers not to return their vehicles.

Plaintiff raises additional arguments premised on the notion that what defendant seeks here is an "equitable offset." Plaintiff argues an equitable offset is an affirmative defense that defendant did not plead in its answer and therefore forfeited. Plaintiff further contends that trial courts have discretion to grant or deny equitable offsets, and the court did not abuse its discretion denying one here.  Finally, plaintiff argues that if defendant is entitled to an equitable offset, it would be "for the value of a vehicle that was not returned," and therefore a bench trial is necessary to determine that value.  In making this last argument, plaintiff asserts that the trade-in credit for the Jeep is not an accurate measure of its market value.

Our conclusion that plaintiff is not entitled to a double recovery is not premised on a discretionary offset under the trial court's equitable power.  Our conclusion is based on an interpretation of the Act's provisions, from which we conclude "restitution" under the Act cannot include amounts the buyer has already obtained by trading in the vehicle.  The issue is not that defendant has been deprived of the value of the traded-in vehicle; it is that plaintiff's double recovery defies the definition of "restitution" and will incentivize buyers to undercut the Act's labeling and notification provisions.  The interpretation that avoids that absurd result is one in which plaintiff's damages are reduced by the amount of her trade-in.  To the extent this

26

constitutes an "offset," it is inherent in the Act, not principles of equity. Plaintiff's arguments based on equitable offset therefore fail.

Plaintiff's briefing suggests that the $19,000 does not even reflect the value plaintiff herself received, and therefore should not be the basis of an offset. Plaintiff states that dealers sometimes assign an artificially high value to a trade-in, then raise the purchase price to compensate. Plaintiff argues there was no evidence that the trade-in credit "*actually* reduced the price of the Yukon."

We reject this argument. Plaintiff testified that she sold the Jeep to the GMC dealer for $19,000, which, in the context of a trade-in, means she received a $19,000 reduction in the price she agreed to pay for the Yukon. The fact that the dealer may have inflated the price of the Yukon or the value of the trade-in is immaterial; what matters is what plaintiff bargained for and received. We hold her to that bargain and reduce her restitution award accordingly.

### 2. It is appropriate to preserve as much of the civil penalty as the Act allows because the jury already factored in the trade-in proceeds plaintiff received

The jury awarded plaintiff a civil penalty of $59,376.65 on damages of $39,584.43. As discussed, section 1794, subdivision (c) caps the civil penalty at twice actual damages. Plaintiff concedes that, to the extent defendant is entitled to reduce the damages it owes by the value of her trade-in, the civil penalty cannot exceed twice the reduced damages. Thus, plaintiff

27

concedes that if we reduce plaintiff's award by $19,000 to $20,584.43, her civil penalty cannot exceed $41,168.86.[8]

Defendant argues that, because the jury imposed a civil penalty one-and-a-half times the amount of the original damages award, that same proportion should apply to the reduced award here, resulting in a penalty of $30,876.65. Defendant claims the "verdict makes clear that the jury did not intend to impose the maximum penalty. Instead, the excessive penalty resulted from the erroneous inflation of [plaintiff's] compensatory damages."

Plaintiff disagrees, arguing that it "would infringe on [her] right to a jury trial if the Court were to reduce the amount a jury decided any more than necessary to ensure the award does not exceed the legal maximum."

Courts have expressed concern that "if the jury is not informed about the mitigation of plaintiff's actual losses, there is a strong likelihood that the jury will return an inflated award of punitive damages." (*Krusi v. Bear, Stearns & Co.* (1983) 144 Cal.App.3d 664, 681, italics omitted.) In such a circumstance, it may be appropriate for the trial court, after determining any offsets to a compensatory damages award, to "consider whether there should be a reduction in the amount of punitive damages." (*Ibid.*; but see *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 537 [appellate court's reduction of compensatory damages did not require reduction of punitive damages award when it was "not so disproportionate as to render it 'suspect' "].)

---

[8] Given plaintiff's concession, we express no opinion whether the civil penalty cap under section 1794, subdivision (c) should be calculated before or after reducing plaintiff's damages to account for a trade-in or resale.

Accepting arguendo that a court may reduce a punitive damage award when the jury was unaware that the plaintiff mitigated her losses, that principle would not apply here. In the instant case, the jury was aware of the mitigation of plaintiff's losses, because the jury heard plaintiff testify that she traded in the Jeep for $19,000. We may assume the jury's civil penalty award factored in that information. We therefore see no reason not to preserve as much of the jury's civil penalty award as is permitted under section 1794, that is, twice plaintiff's reduced damages. Given that conclusion, we do not reach plaintiff's argument regarding her right to a jury trial.

## DISPOSITION

The award to plaintiff is reduced to $61,753.29, reflecting damages of $20,584.43 and a civil penalty of $41,168.86. As modified, the judgment is affirmed. Defendant is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.              CHANEY, J.




29